John M. Hochhausler
State Bar No. 143801
MANNING & MARDER
KASS, ELLROD, RAMIREZ
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017
Telephone: (213) 624-6900
Email: jmh@mmker.com

Attorneys for Plaintiff
State Farm Fire & Casualty Company

COPY

FILED
CLERK, U.S. DISTRICT COURT
MAR - 9 2010
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| State Farm Fire & Casualty Company, an Illinois corporation, Plaintiff, vs. Crown Technology Assisted Business Services, Corp; a California Corporation; Steve King and Amanda Powell, Defendants. | Case No.: SACV10-00286 CJC(MLGx) **COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff, State Farm Fire & Casualty Company alleges as follows:

1. This is an action for declaratory judgment pursuant to 28 U.S.C. §§2201-2202. State Farm Fire & Casualty Company seeks this Court's determination concerning the respective rights and obligations of the parties under a "Technology Services Errors and Omissions Liability Insurance Policy" issued by State Farm Fire & Casualty Company to "DI Imaging" in connection with an underlying lawsuit filed by Data Impact, Inc.

2. An actual and justiciable controversy exists between the parties as to which a declaratory judgment setting forth their respective rights and obligations

under the subject insurance policy is necessary and appropriate.

3. This Court has original jurisdiction over this civil action under 28 U.S.C. § 1332(a).

4. State Farm Fire & Casualty Company is an Illinois corporation with its principal place of business in Bloomington, Illinois.

5. Crown Technology Assisted Business Services, Corp. ("C-TABS") is a California corporation with its principal place of business in Orange County, California. Steve King and Amanda Powell are individuals residing in Orange County, California.

6. In the underlying action, Data Impact seeks damages for business torts in excess of $75,000. Therefore, the amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

7. Venue is proper in this District as the Defendants reside in this District.

## FIRST CLAIM FOR RELIEF

### Against All Defendants For Declaratory Relief

8. State Farm Fire & Casualty Company realleges paragraphs 1 through 7 above.

9. State Farm Fire & Casualty Company issued a "Technology Services Errors and Omissions Liability Insurance Policy" policy number PS0000003286300 to "DI Imaging." A copy of the Policy is attached hereto as Exhibit A.

10. Data Impact filed suit against C-TABS, King and Powell among others in the Orange County Superior Court, case number 30-2009-00119746 (the "Underlying Action"). Defendants tendered the first amended complaint in the Underlying Action to State Farm Fire & Casualty Company. A copy of the first amended complaint is attached hereto as Exhibit B. The Underlying Action alleges that Defendants committed various business torts.

11. By letter dated October 19, 2009, State Farm Fire & Casualty Company

confirmed that it had accepted the defense of the Underlying Action subject to a reservation of rights. Among the rights reserved was the right to withdraw the defense and to recoup the costs of defense if it was determined that the Underlying Action was not covered by the Policy. A copy of the Reservation of Rights letter is attached hereto as Exhibit C.

12. State Farm Fire & Casualty Company contends that there is no coverage for the Underlying Action, because, among other reasons, the Policy only provides coverage for "Wrongful Acts in performing Technology Services" and the misconduct asserted against Defendants in the Underlying Action do not involve "Technology Services." Defendants contend that there is coverage for the Underlying Action. A declaration from the Court as to the coverage, or lack thereof, for the Underlying Action under the Policy is appropriate so that the parties may know their rights and obligations.

**SECOND CLAIM FOR RELIEF**

**Against All Defendants For Recoupment**

13. State Farm Fire & Casualty Company realleges paragraph 1 through 12 above.

14. If the Court determines that there is no coverage for the Underlying Action, State Farm Fire & Casualty Company is entitled to recoup from Defendants the costs it has incurred defending Defendants against the Underlying Action.

WHEREFORE State Farm Fire & Casualty Company prays for judgment as follows:

A. For a declaration that the Policy does not provide coverage for the Underlying Action and that State Farm Fire & Casualty Company is entitled to withdraw its defense and has no duty to indemnify Defendants.

B. For recoupment of all defense costs paid by State Farm Fire & Casualty

Company for the defense of Defendants against the Underlying Action.

C. For costs of suit and for such other and further relief as the Court deems just and proper.

Dated: March 8, 2010

MANNING & MARDER
KASS, ELLROD, RAMIREZ

By: John M. Hochhausler
Attorneys for Plaintiff,
State Farm Fire & Casualty Company

# EXHIBIT A

STATE FARM INSURANCE

# TECHNOLOGY SERVICES

## ERRORS AND OMISSIONS

## LIABILITY INSURANCE POLICY

**YOUR** POLICY INCLUDES THIS FRONT PAGE AND THE FOLLOWING PARTS:


| | |
|---|---|
| PART 1. | Declarations Page |
| PART 2. | Notices |
| PART 3. | Quick Reference to Policy Provisions |
| PART 4. | Introduction |
| PART 5. | Insuring Agreements and Exclusions |
| PART 6. | Definitions Used in This Policy |
| PART 7. | General Conditions |
| PART 8. | Endorsements |
| PART 9. | A Copy of **Your** Signed **Application or Renewal Application** |


**ALL OF THESE PARTS MUST BE INCLUDED TO MAKE A COMPLETE POLICY.**

**State Farm Fire and Casualty Company**
A Stock Company with Home Offices in Bloomington, Illinois
Herein called the Insurer

**TECHNOLOGY SERVICES ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY**

Policy No: PS0000003286300
Renewal of Policy No:

**PART 1. DECLARATIONS PAGE**

THIS IS A CLAIMS MADE POLICY. **DEFENSE COSTS** ARE INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY.

THIS DECLARATIONS PAGE, ALONG WITH **YOUR** SIGNED **APPLICATION OR RENEWAL APPLICATION** AND ALL FORMS AND ENDORSEMENTS LISTED IN ITEM 7. BELOW COMPLETE THE POLICY.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, **WE** AGREE WITH **YOU** TO PROVIDE INSURANCE UNDER THE PROVISIONS OF THIS POLICY.

Item 1. **Named Insured**: DI IMAGING

Address: 9532 Drumbeat Drive
Huntington Beach, CA 92646

Item 2. **Policy Period**:
Effective Date: October 2, 2008 Expiration Date: October 2, 2009
(12:01 A.M. Standard Time at the Address stated in Item 1.)

Item 3. **Retroactive Date**: October 02, 2008 IF NO DATE IS STATED HERE, COVERAGE DOES NOT APPLY TO **WRONGFUL ACTS** COMMITTED PRIOR TO THE EFFECTIVE DATE STATED IN ITEM 2. ABOVE.

**PART 1. DECLARATIONS PAGE (Continued)**

**Named Insured:** DI IMAGING
Policy No: PS0000003286300

| | | | | |
|---|---|---|---|---|
| Item 4. | Limit of Liability: | a. | $1,000,000 | Each **Wrongful Act** |
| | | b. | $1,000,000 | Total Limit of Liability |
| Item 5. | Retention: | | $2,500 | Each **Wrongful Act** |
| Item 6. | Premium: | | $2,466.00 | |

Item 7. Form(s) and Endorsement(s) made part of this Policy at the time of issuance:

| | |
|---|---|
| PSTK5000(08/02) | Technology Services Errors and Omissions Liability Insurance Policy |
| PSTK5004(01/01) | Technology Services Contingent Bodily Injury/Property Damage Endorsement |
| PSTK5009CA(12/02) | California Amendatory Endorsement |

Item 8. Notices to the Insurer - All notices to the Insurer pertaining to this Policy must be sent to:

State Farm Specialty Products
111 North Canal Street, Suite 940
Chicago, IL 60606-7201

Date of Issue: October 3, 2008

By: [signature]
Authorized Representative

PART 2. NOTICES

A. **Claims Made Policy:**

This insurance coverage is on a claims made basis. Coverage applies only to those **Claims** that are first made during the **Policy Period** and any Extended Reporting Period as those terms are described in the Policy. Coverage does not apply to any **Wrongful Acts** committed before the **Retroactive Date** stated on the Declarations Page.

B. **Defense Costs Within the Limit:**

This insurance coverage contains a provision that reduces the Limit of Liability stated in the Policy by the amount of **Defense Costs**.

C. **Awareness:**

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine **Your** rights and duties, and what is and is not covered. **We** will not pay sums or perform acts or services unless explicitly provided for in this Policy.

## PART 3. QUICK REFERENCE TO POLICY PROVISIONS

The following is a quick reference indexing of **Your** Policy's provisions, listed in sequential order. The descriptions in the quick reference are not binding. The quick reference should only be used to help **You** locate the actual Policy provisions.


| | | Page |
|---|---|---|
| PART 1. | DECLARATIONS PAGE | 2-3 |
| PART 2. | NOTICES | |
| | A. Claims Made Policy | 4 |
| | B. **Defense Costs** Within the Limit | 4 |
| | C. Awareness | 4 |
| PART 3. | THIS SECTION – QUICK REFERENCE TO POLICY PROVISIONS | 5-6 |
| PART 4. | INTRODUCTION | 7 |
| PART 5. | INSURING AGREEMENTS AND EXCLUSIONS | |
| | A. What **We** Insure | 8 |
| | B. Defense and Settlement | 8 |
| | C. What **We** Do Not Insure – Exclusions | 9-11 |
| | D. Where and When **We** Insure | 11-14 |
| | 1. Where **We** Insure | 11 |
| | 2. When **We** Insure | 11-14 |
| | a. **Claims** First Made | 11 |
| | b. Prior **Wrongful Acts** | 11-12 |
| | c. Reported **Wrongful Acts** | 12 |
| | d. Extended Reporting Period | 13-14 |
| | e. Multiple **Claims** | 14 |
| | E. Limit of Liability, Retention and Reimbursement | 14-15 |
| | 1. Limit of Liability | 14 |
| | a. Each **Wrongful Act** | 14 |
| | b. Total Limit of Liability | 15 |
| | 2. Retention | 15 |
| | 3. Reimbursement | 15 |
| PART 6. | DEFINITIONS USED IN THIS POLICY | |
| | A. **Application or Renewal Application** | 15 |
| | B. **Bodily Injury** | 15 |
| | C. **Claim** | 15 |
| | D. **Damages** | 16 |
| | E. **Defense Costs** | 16 |
| | F. **Named Insured** | 16 |
| | G. **Policy Period** | 17 |
| | H. **Property Damage** | 17 |
| | I. **Retroactive Date** | 17 |
| | J. **Technology Services** | 17 |
| | K. **Wrongful Act** | 17-18 |

PART 7. GENERAL CONDITIONS
A. Special Rights and Duties of the First **Named Insured** .......... 18
B. What to Do if **You** have a **Claim** or Suit .......... 18-19
C. Legal Action Against **Us** .......... 19
D. Bankruptcy .......... 19
E. Other Insurance .......... 19
F. Transfer of Rights of Recovery Against Others to **Us** .......... 19
G. Changes in Policy Provisions; Changes in **Your** Operations .......... 20
H. Transfer of **Your** Rights and Duties Under the Policy .......... 20
I. Cancellation .......... 20
J. Nonrenewal .......... 20
K. Representations .......... 20-21

PART 8. ENDORSEMENTS .......... 22

PART 9. A COPY OF **YOUR** SIGNED **APPLICATION OR RENEWAL APPLICATION** .......... 23

## PART 4. INTRODUCTION

The words **We**, **Us** and **Our** refer to the Insurer named on the Declarations Page.

The words **You** and **Your** refer individually and collectively to:

1. The **Named Insured** as defined in Part 6.F.;

2. The **Named Insured's** stockholders for their liability as stockholders;

3. The **Named Insured's** partners, officers, directors and employees, but only for **Wrongful Acts** within the scope of their duties in such capacity for the **Named Insured**;

4. Former partners, officers, directors and employees of the **Named Insured**, but only for **Wrongful Acts** both:

    a. Within the scope of their duties in such capacity for the **Named Insured**; and

    b. Made while they were the **Named Insured's** partner, officer, director or employee; and

5. In the event of death, incompetency, insolvency or bankruptcy of any of **You**, **Your** legal representative but only for **Wrongful Acts** within the scope of their duties for the **Named Insured**.

Other words or phrases that are **bold-faced** have special meaning. Refer to Part 6.

## PART 5. INSURING AGREEMENTS AND EXCLUSIONS

### A. What We Insure

**We** will pay on **Your** behalf those sums in excess of the Retention and up to the applicable Limit of Liability stated in Item 4. of the Declarations Page that **You** become legally obligated to pay as **Damages** or **Defense Costs** because of **Claims** as a result of a **Wrongful Act** in performing **Technology Services**. Depending on where a **Claim** is first brought, **We** will have the right and duty to appoint an attorney, investigate and defend any **Claim** to which this insurance applies, even if the allegations are groundless, false or fraudulent, or **We** will reimburse **You** for the reasonable cost of investigation and defense of any such **Claim**, as provided in Part 5.B. below.

### B. Defense and Settlement

1. For **Claims** first brought inside the United States of America (including its territories or possessions), Puerto Rico or Canada, **We** will have the right and duty to appoint an attorney, investigate and defend any **Claim** to which this insurance applies. **Our** right and duty to defend and pay on **Your** behalf ends when **We** have used up the applicable Limit of Liability in payment of **Damages** or **Defense Costs**.

2. For **Claims** first brought outside the United States of America (including its territories or possessions), Puerto Rico or Canada, **We** will have the right but not the duty to appoint an attorney, investigate and defend any **Claim** to which this insurance applies. If **We** elect not to appoint an attorney, investigate or defend a **Claim** to which this insurance applies, the First **Named Insured** will arrange for the investigation and defense of such **Claim** as is reasonably necessary. **We** will reimburse **You** for the reasonable cost of investigation and defense exceeding the Retention, all subject to and within the applicable Limit of Liability stated in the Declarations Page. Reimbursement shall be made in United States dollars at the rate of exchange prevailing on the date **You** made the expenditure.

3. **You** will not settle any **Claim** without **Our** prior written consent. If the First **Named Insured** notifies **Us** in writing in advance that the First **Named Insured** disagrees about the final disposition of any **Claim**, the following conditions will apply:

    a. If the First **Named Insured** is willing to accept a settlement offered by a claimant and **We** are not, or if the First **Named Insured** is unwilling to appeal a judgment of a trial court, **We** have the right to continue defense of the **Claim** and not settle or appeal such judgment provided **We** bear all costs and expenses, including incidental interest of such continued litigation. An increase in the judgment amount or **Defense Costs** in such instance will not be applied against **Your** Limit of Liability; or

    b. If **We** are satisfied with the judgment of the trial court, or with any settlement offered, but the First **Named Insured** is not, **We** may pay to the First **Named Insured** the difference between the amount of the settlement or judgment and the remaining **Retention**, if any, and **We** will then be relieved from further obligation for **Damages**, **Defense Costs** or defense concerning the **Claim**.

C. **What We Do Not Insure – Exclusions**

1. We are not obligated to pay **Damages** or **Defense Costs** or defend **Claims** for. arising directly or indirectly out of, or alleging:

   a. **Bodily Injury** or **Property Damage**;

   b. Infringement of:

      (1) Copyright;

      (2) Trademark, trade dress, trade name, service mark, service name, title or slogan; or

      (3) Patent;

   c. Malfunction or defect of any hardware, equipment, device or component. This exclusion does not apply when the malfunction or defect is the result of **Your Wrongful Act**;

   d. Unfair competition, restraint of trade or any other violation of antitrust laws;

   e. Harassment, misconduct or discrimination because of or relating to:

      (1) Race, creed, color or age;

      (2) Sex, gender, sexual preference, marital status, military service, national origin or religion;

      (3) Handicap, disability or health condition;

      Or any other similar conduct prohibited by federal, state or local laws;

   f. Unauthorized access to, use of, tampering with or introduction of malicious code into data or systems by any of **You** or person who would qualify as **You** but for their acts being outside the scope of their duties as a partner, officer, director or employee of the **Named Insured**;

   g. Gain, profit or advantage to which any of **You** are not legally entitled;

   h. Assumption of liability by any of **You** under any contract or agreement. This exclusion does not apply to liability **You** would have incurred in the absence of such contract or agreement;

   i. Any delay in the performance of any services, contracts or agreements. This exclusion does not apply when the delay is the result of **Your Wrongful Act**;

   j. Any cost guarantees or estimates being exceeded or any cost overruns;

   k. The withdrawal or recall of any of **Your** products or services from the market or from use by others. This exclusion does not apply to costs or expenses incurred by **Your** customer to withdraw or recall **Your** customer's product or services from the market or from use by others if the withdrawal or recall is the result of **Your Wrongful Act**;

l. Acts by any of **You** related to any pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts; or any violation of any provisions of the Employee Retirement Income Security Act of 1974, or any amendment, regulation, ruling or order issued pursuant to the Act or any similar provisions of any federal, state or local law;

m. Violation of:

(1) The Security Act of 1933 as amended;

(2) The Securities Exchange Act of 1934 as amended;

(3) Any state blue sky or securities law;

(4) Any similar state or federal law; or

(5) Any order, ruling or regulation issued pursuant to the above laws;

n. Insolvency or bankruptcy of:

(1) Any of **You**; or

(2) Any enterprise in which any of **You** own an interest;

o. The actual or threatened discharge, dispersal or release of any **Pollutant**; or the creation of an injurious condition involving any **Pollutant**; or the existence of any **Pollutant** on any property; or the cleanup, removal, testing, monitoring, containment, treatment, detoxification or neutralization of any **Pollutant**. This exclusion is effective whether or not the pollution was sudden, accidental, gradual, intended, expected or preventable or whether or not any of **You** caused or contributed to the pollution;

**"Pollutant"** means any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to:

(1) Smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead, mold or asbestos;

(2) Hazardous, toxic or radioactive matter or nuclear radiation;

(3) Waste, which includes material to be recycled, reconditioned or reclaimed; or

(4) Any other pollutant as defined by applicable federal, state or local statutes, regulations, rulings or ordinances.

2. **We** are not obligated to pay **Damages** or **Defense Costs** or defend **Claims** made by:

a. Any enterprise:

(1) In which any of **You**, individually or collectively, own an interest greater than 10% of the total ownership;

(2) In which any of **You** is a partner; or

(3) Which is a parent, affiliate or subsidiary company of any of **You**;

b. Any enterprise directly or indirectly controlled, operated or managed by an enterprise described in Part 5.C.2.a. above;

c. Any of **You**;

d. Any present, former or prospective employees, officers or directors of any of **You** when the **Claim** is in any way related to the present, former or prospective employment relations between the claimant and any of **You**; or

e. Any regulatory authority or any international, national, state or local governmental agency, including any related administrative actions, decisions, orders, rulings or proceedings. However, this exclusion will not apply when the **Claim** is brought in their capacity as a client as a result of **Technology Services** performed by **You** on their behalf.

3. **We** are not obligated to pay **Damages** or **Defense Costs** or defend **Claims** for:

a. The breach of express warranties, guarantees or contracts; or

b. An act or omission that a jury, court or arbitrator finds dishonest, fraudulent, criminal, malicious or was intentionally committed while knowing it was wrongful.

This Exclusion 3.b. does not apply to **Defense Costs We** incur prior to the final adjudication by the jury, court or arbitrator. However, upon that adjudication **We** will have the right to seek recovery of the **Defense Costs** incurred from the party(ies) found to have committed the acts or omissions described above.

**D. Where and When We Insure**

**1. Where We Insure**

The territory of this insurance is universal. If **Damages** or **Defense Costs** are paid in a currency other than United States of America dollars, then the payment under this Policy will be considered to have been made in United States of America dollars at the conversion rate which was used for the payment.

**2. When We Insure**

a. **Claims** First Made

This insurance applies when a written **Claim** is first made against any of **You** during the **Policy Period**. To be covered, the **Claim** must also arise from a **Wrongful Act** committed during the **Policy Period**.

**We** will consider a **Claim** to be first made against **You** when a written **Claim** is first received by any of **You**.

This insurance also applies to **Claims** under the following conditions:

b. Prior **Wrongful Acts**

**We** will cover a written **Claim** first made against any of **You** arising from a **Wrongful Act** committed between the **Retroactive Date** and the Effective Date of this Policy, but only if all of the following conditions are met:

(1) The written **Claim** is first made against any of **You** during the **Policy Period. We** will consider a **Claim** to be first made against **You** when a written **Claim** is received by any of **You**;

(2) None of **You** knew, prior to the Effective Date of the first of one or more technology services errors and omissions policies issued to **You** by State Farm Mutual Automobile Insurance Company or its affiliates which together provided continuous coverage until the Effective Date of this Policy, of a circumstance that could reasonably be expected to lead to the **Claim**; and

(3) There is no other valid and collectible errors and omissions insurance for the **Claim**.

c. Reported **Wrongful Acts**

**We** will cover a written **Claim** first made against any of **You** after the end of the **Policy Period**, but only if all of the following conditions are met:

(1) The **Wrongful Act** is committed between the **Retroactive Date** and the end of the **Policy Period**;

(2) **We** receive written notice from **You** during the **Policy Period** of the **Wrongful Act**. The notice must include all of the following information:

(a) The names of those persons or organizations involved in the **Wrongful Act**;

(b) The specific person or organization likely to make the **Claim**;

(c) A description of the time, place and nature of the **Wrongful Act**; and

(d) A description of the potential **Damages**;

(3) None of **You** knew, prior to the Effective Date of the first of one or more technology services errors and omissions policies issued to **You** by State Farm Mutual Automobile Insurance Company or its affiliates which together provided continuous coverage until the Effective Date of this Policy, of a circumstance that could reasonably be expected to lead to the **Claim**; and

(4) There is no other valid and collectible errors and omissions insurance for the **Claim**.

A **Claim** first made after the end of the **Policy Period** and arising from a reported **Wrongful Act** will be covered under the provisions of the Policy in effect on the date **We** receive the notice of the **Wrongful Act**.

d. Extended Reporting Period

This section describes the provisions and conditions that apply to **Claims** first made after the end of the **Policy Period** when **You** have not reported a **Wrongful Act** during the **Policy Period** in accordance with Part 5.D.2.c. above. Such **Claims** are not automatically covered. To cover them, the First **Named Insured** must purchase an Extended Reporting Period from **Us**.

If the First **Named Insured** purchases an Extended Reporting Period, **We** will cover a **Claim** first made against any of **You** during the Extended Reporting Period, but only if all of the following conditions are met:

(1) The **Wrongful Act** is committed between the **Retroactive Date** and the end of the **Policy Period**;

(2) None of **You** knew, prior to the Effective Date of the first of one or more technology services errors and omissions policies issued to **You** by State Farm Mutual Automobile Insurance Company or its affiliates which together provided continuous coverage until the Effective Date of this Policy, of a circumstance that could reasonably be expected to lead to the **Claim**; and

(3) There is no other valid and collectible errors and omissions insurance for the **Claim**.

**We** will consider a **Claim** to be made during the Extended Reporting Period only if written **Claim** is first received by any of **You** after the Expiration Date of the **Policy Period** and prior to the Expiration Date stated in the Extended Reporting Period Endorsement.

The following provisions and conditions also apply to the Extended Reporting Period:

(4) If **You** or **We** cancel or nonrenew the Policy, and upon request by the First **Named Insured**, **We** will sell one of the Extended Reporting Period options listed below, unless **We** cancel or nonrenew the Policy because:

(a) Any of **You** failed to pay the premium or Retention; or

(b) Any of **You** failed to comply with the Policy provisions.

Extended Reporting Period options and the respective percentage of the Premium, as stated in Item 6. of the Declarations Page, **You** must pay to purchase the Extended Reporting Period are:

| | | |
|---|---|---|
| One Year | = | 50% |
| Two Years | = | 90% |
| Three Years | = | 125% |

Changes or proposed changes in premium or policy provisions shall not be construed as cancellation or nonrenewal of the Policy by **Us**.

(5) **We** must receive the First **Named Insured's** request for the Extended Reporting Period in writing within thirty (30) days after the end of the **Policy Period**. On receipt and acceptance of the request, **We** will issue an endorsement showing the Extended Reporting Period in accordance with the option requested by the First **Named Insured**. At the same time, **We** will bill the additional premium, and **We** must receive payment within thirty (30) days after the billing date for the endorsement to be effective.

(6) The endorsement shall also include the provisions and conditions applicable to the Extended Reporting Period. Once in effect, the Extended Reporting Period may not be cancelled.

(7) A **Claim** that is first made during the Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**. The provisions of the Policy in effect on the last day of the **Policy Period** will apply.

(8) The Extended Reporting Period does not reinstate or increase the Limit of Liability.

(9) The Extended Reporting Period does not extend the **Policy Period** or change the scope of coverage provided.

e. Multiple **Claims**

All **Claims** arising from the same **Wrongful Act** will be deemed to have been made on the earlier of the following times:

(1) The date the first of those **Claims** is made against any of **You**; or

(2) The first date **We** receive **Your** written notice of the **Wrongful Act**.

The provisions of the Policy in effect on that date will apply.

**E. Limit of Liability, Retention and Reimbursement**

1. **Limit of Liability**

a. Each **Wrongful Act**

The Each **Wrongful Act** Limit of Liability stated in Item 4.a. of the Declarations Page is the most **We** will pay for **Damages** and **Defense Costs** combined for the total of all **Claims** made during the **Policy Period** and any Extended Reporting Period arising from one **Wrongful Act**, no matter how many:

(1) Of **You** this Policy covers;

(2) **Claims** are made; or

(3) Persons or organizations make **Claims**.

b. Total Limit of Liability

The Total Limit of Liability stated in Item 4.b. of the Declarations Page is the most **We** will pay for **Damages** and **Defense Costs** combined for the total of all **Claims** made during the **Policy Period** and any Extended Reporting Period, no matter how many:

(1) Of **You** this Policy covers;

(2) **Claims** are made;

(3) Persons or organizations make **Claims**; or

(4) **Wrongful Acts** are committed.

2. **Retention**

A separate Retention applies to each **Wrongful Act**. The Retention applies to **Damages** and **Defense Costs** combined, and **Our** obligation to pay **Damages** and **Defense Costs** applies only to the amount of **Damages** and **Defense Costs** in excess of the Retention. The Limit of Liability will not be reduced by the application of the Retention. The amount of **Your** Retention is stated in Item 5. of the Declarations Page.

3. **Reimbursement**

If, at **Our** option, **We** have paid any amounts for **Damages** or **Defense Costs** in excess of the applicable Limit of Liability or if **We** have paid part or all of any Retention, the **Named Insured** shall be liable to reimburse such amounts to **Us** upon demand.

PART 6. DEFINITIONS USED IN THIS POLICY

A. **"Application or Renewal Application"** means all the following:

1. The **Named Insured's** signed Technology Services Errors and Omissions Liability Insurance Policy Application;

2. The **Named Insured's** signed Technology Services Errors and Omissions Liability Insurance Renewal Application, if this is a renewal of a policy issued by **Us**; and

3. All attachments to the **Application or Renewal Application** and any other information furnished to **Us** for the purpose of applying for the insurance. All such attachments and information will be kept on file by **Us** and deemed attached to and a part of the Policy as if physically attached to it.

B. **"Bodily Injury"** means physical injury, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily Injury** also means disability, emotional distress, mental anguish, mental injury, shock or fright resulting in or from **Bodily Injury**.

C. **"Claim"** means a demand or assertion of a legal right seeking **Damages** made against any of **You**.

D. **"Damages"** means money judgment, award or settlement, except those for which insurance is prohibited by law. **Damages** does not include:

1. fines or penalties;

2. royalties, fees, refunds, deposits, commissions or charges for goods or services;

3. loss or disgorgement of profits by any of **You**; or

4. costs of correcting, performing or reperforming **Technology Services** by **You** or another party when **You** had the capability to correct, perform, or reperform the service that generated the cost.

E. **"Defense Costs"** means expenses incurred by **Us** or by **You** with **Our** consent in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **Claims**, whether paid by **Us** or **You** with **Our** consent. **Defense Costs** include:

1. Expenses **We** incur, other than salary or adjustment expenses of **Our** regular employees or officials or fees and expenses of independent adjusters;

2. Reasonable and necessary attorneys fees;

3. Costs taxed against **You** in any suit defended by **Us** and to which this insurance applies;

4. Pre-judgment interest and the interest on the full amount of any judgment that accrues after entry of the judgment and before **We** have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Liability;

5. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable Limit of Liability. **We** do not have to furnish these bonds; and

6. Reasonable expenses incurred by **You** at **Our** request other than:

   a. Loss of earnings; and

   b. Salaries or other compensation paid to any of **You**.

F. **"Named Insured"** means:

1. The person or entity listed in Item 1. of the Declarations Page; and

2. Any entity which is created or acquired during the **Policy Period** and which is wholly-owned by another **Named Insured**. This provision applies only:

   a. To **Technology Services** performed on or after the date of creation or acquisition of the new **Named Insured**;

   b. If **You** advise **Us** within sixty (60) days of the creation or acquisition and provide reasonable information for **Us** to evaluate for material changes in conditions which may affect insurance afforded by the Policy; and

   c. If **You** agree to pay any additional premium **We** believe is reasonable and necessary as a result of the material changes.

The First **Named Insured** is the **Named Insured** first listed on the Declarations Page.

G. **"Policy Period"** means the period of time stated in Item 2. of the Declarations Page, or any shorter period resulting from Policy cancellation.

H. **"Property Damage"** means physical injury to tangible property and any resulting loss or corruption of data or information, including all resulting loss of use of that property, data or information. **Property Damage** does not mean the loss, corruption or destruction of data or information when the tangible property on which the data or information resides or resided is not physically injured.

I. **"Retroactive Date"** means the date, if any, stated in Item 3. of the Declarations Page.

J. **"Technology Services"** means the following work performed for others:

1. The development, programming, integration, implementation, installation, maintenance and repair of software, code, hardware, equipment, devices and components;

2. Management, administration, hosting or operation of another party's systems (outsourcing services);

3. Systems facility management;

4. Systems consulting including software, hardware, equipment, device and component analysis and recommendations;

5. The distribution, licensing, sales, marketing, training and customer support in the use of software and hardware including freeware, shareware, firmware, equipment, devices and components; or

6. Data processing, management, storage and warehousing.

K. **"Wrongful Act"** means the following conduct or alleged conduct by **You** or any person or organization for whom **You** are legally liable:

1. A negligent act, error or omission;

2. Failure to prevent a party other than any of **You** from: unauthorized access to, use of, tampering with or introduction of malicious code into data, programs or systems;

3. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

4. Oral or written publication of material that violates a person's right to privacy;

5. False arrest, detention or imprisonment;

6. Wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;

7. Malicious prosecution; or

8. Unintentional breach of warranties or representations made by **You** regarding the fitness, quality, durability and standards of **Your** performance of **Technology Services**.

All **Wrongful Acts** that:

1. Take place between the **Retroactive Date** and the end of the **Policy Period** of the last policy **We** issue to **You**, and

2. Are logically or causally connected by common facts, circumstances, situations, transactions, events and/or decisions

will be treated under this Policy as one **Wrongful Act**.

**PART 7. GENERAL CONDITIONS** – These conditions apply to the entire Policy.

**A. Special Rights and Duties of the First Named Insured**

The First **Named Insured** is responsible for the payment of all premiums and Retentions. The First **Named Insured** has exclusive authority to act on behalf of all of **You** with respect to matters relating to this Policy, including:

1. Giving and receiving notice of cancellation and nonrenewal;

2. Receiving refunds;

3. Agreeing to any changes to this Policy;

4. Arranging for the investigation and defense of **Claims**, as necessary;

5. Notifying **Us** about any disagreement as to the final disposition of any **Claim**; and

6. Purchasing an Extended Reporting Period.

**B. What to Do if You Have a Claim or Suit**

1. If there is a **Claim** or a circumstance likely to result in a **Claim**, **You** must do the following:

   a. Notify **Us** in writing as soon as practicable; this notice must:

      (1) Be sent to **Us** at the address specified in Item 8. of the Declarations Page; and

      (2) Contain details that identify **You**, the claimant and also reasonably obtainable information concerning the time, place and other details of the **Wrongful Act** and **Claim**;

   b. Immediately send **Us**, at the address specified in Item 8. of the Declarations Page, copies of all demands, notices, summonses or legal papers received in connection with the **Claim**;

c. Authorize **Us** to obtain records and other information;

d. Cooperate with and assist **Us** in the investigation, settlement and defense of the **Claim**; and

e. Assist **Us**, upon **Our** request, in enforcing any rights of contribution or indemnity against another who may be liable to any of **You**.

2. None of **You** will, except at **Your** own cost, voluntarily make a payment, admit liability, assume any obligation or incur any expense without **Our** prior written consent.

**C. Legal Action Against Us**

No person or organization has a right under this insurance:

1. To join **Us** as a party or otherwise bring **Us** into a suit asking for **Damages** from any of **You**; or

2. To sue **Us** on this insurance unless all of the Policy's provisions have been fully complied with.

A person or organization may sue **Us** to recover on "an agreed settlement" or on a final judgment against **You** obtained after an actual trial; but **We** will not be liable for **Damages** and **Defense Costs** that are not payable under the provisions of this insurance or that are in excess of the applicable Limit of Liability. "An agreed settlement" means a settlement and release of liability signed by **Us**, **You** and the claimant or the claimant's legal representative.

**D. Bankruptcy**

The bankruptcy or insolvency of **You** or **Your** estate will not relieve **Us** of **Our** obligation under this insurance. However, this insurance will not apply to liability directly or indirectly due to such bankruptcy, insolvency, receivership or subsequent liquidation.

**E. Other Insurance**

If other valid and collectible insurance is available to any of **You** for any **Claim We** cover, this insurance is excess over such other insurance, except when the other insurance is purchased by the **Named Insured** specifically to apply in excess of this insurance and no other insurance exists.

**F. Transfer of Rights of Recovery Against Others to Us**

**You** and **We** may have rights to recover all or part of any payment **You** or **We** make under this insurance. If so, those rights are transferred to **Us**.

**You** must do nothing to impair such rights. At **Our** request, **You** will bring suit or transfer those rights to **Us** and help **Us** enforce them. Any recoveries shall be applied as follows:

1. First, to **Us** up to the amount of **Our** payment for **Damages** and **Defense Costs**;

2. Then, to the First **Named Insured** as recovery of Retention amounts paid as **Damages** and **Defense Costs**.

G. **Changes in Policy Provisions; Changes in Your Operations**

1. This Policy contains all the agreements between the **Named Insured** and **Us** concerning the insurance afforded by this Policy. This Policy's provisions can be amended or waived only by written endorsement issued by **Us** and made a part of this Policy.

2. This Policy applies only to the **Technology Services** and **Named Insured(s)** as defined in the Policy or by endorsement as of the Effective Date of the **Policy Period**. This Policy shall not apply to any other services or enterprises unless such services or enterprises are added by written endorsement issued by **Us** and made a part of this Policy. If an endorsement is added, **You** shall promptly pay any additional premium that may become due.

H. **Transfer of Your Rights and Duties Under the Policy**

**Your** rights and duties under this Policy may not be transferred without **Our** written consent.

I. **Cancellation**

1. The First **Named Insured** may cancel this Policy by mailing or delivering to **Us** or **Our** authorized representative advance written notice of cancellation.

2. **We** may cancel this Policy by mailing or delivering to the First **Named Insured** written notice of cancellation at least:

   a. ten (10) days before the effective date of cancellation if **We** cancel for nonpayment of premium; or

   b. sixty (60) days before the effective date of cancellation if **We** cancel for any other reason.

   **We** will mail or deliver **Our** notice to the address stated in Item 1. of the Declarations Page.

   Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

   If this Policy is canceled, **We** will send the First **Named Insured** any premium refund due and the refund will be pro rata. The cancellation will be effective even if **We** have not made or offered a refund.

   If notice is mailed, proof of mailing will be sufficient proof of notice.

J. **Nonrenewal**

**We** may elect to nonrenew this Policy by mailing or delivering to the First **Named Insured** written notice of nonrenewal at least sixty (60) days before the Expiration Date. **We** will mail or deliver **Our** notice to the address stated in Item 1. of the Declarations Page.

K. **Representations**

By accepting this Policy, **You** agree:

1. The statements in the **Application or Renewal Application** for this insurance furnished to **Us** are accurate and complete;

2. Those statements furnished to **Us** are representations the **Named Insured** made to **Us** on behalf of all of **You**;

3. Those representations are a material inducement to **Us** to issue this Policy;

4. **We** have issued this Policy in reliance upon those representations; and

5. If this Policy is a renewal of a policy issued by **Us, Your** representations include the representations made in **Your** original signed Technology Services Errors and Omissions Liability Insurance Policy Application, but only as of the Effective Date of the original policy issued by State Farm Mutual Automobile Insurance Company or its affiliates. The representations **You** make on **Your** Technology Services Errors and Omissions Liability Insurance Renewal Application(s) apply as of the Effective Date of **Your** renewal policy(ies).

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed and attested, but this Policy will not be valid unless countersigned by a duly authorized representative of the Insurer, to the extent required by applicable law.

Edward B. Rust, Jr., President

Kim M. Brunner, Secretary

**PART 8. ENDORSEMENTS**

Required endorsements are attached to the back of this Policy.

**PART 9. A COPY OF YOUR SIGNED APPLICATION OR RENEWAL APPLICATION**

A copy of **Your** signed **Application or Renewal Application** is attached to the back of this Policy.

ENDORSEMENT

Issued to: DI IMAGING
Policy Number: PS0000003286300
Endorsement number:
(applicable when the endorsement is not issued with the Policy or takes effect after the effective date of the Policy)

## TECHNOLOGY SERVICES CONTINGENT BODILY INJURY/PROPERTY DAMAGE ENDORSEMENT

**You** and **We** agree Part 5.C.1.a. of the Policy is changed to:

a. **Bodily Injury** and **Property Damage**, except this exclusion does not apply to **Damages** or **Defense Costs** arising out of the content of information or data developed and/or disseminated by any of **You** in performing **Technology Services**.

The exception stated above will apply only if **You** maintain during this **Policy Period** commercial general liability insurance with a minimum limit of liability of $1,000,000 applying to all of **Your** operations.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of the Policy and takes effect on the effective date indicated below.

Effective date of this endorsement: October 2, 2008

If this endorsement is issued as part of the Policy on the Effective Date shown in the Declarations Page, then the countersignature on the Declarations Page also applies to this endorsement. If this endorsement is not issued with the Policy or takes effect after the Effective Date of the Policy, an Authorized Representative of the Insurer must countersign in the space below to validate the endorsement.

By: [signature]
Authorized Representative

ENDORSEMENT

Issued to: DI IMAGING
Policy Number: PS0000003286300
Endorsement number:
(applicable when the endorsement is not issued with the Policy or takes effect after the effective date of the Policy)

## CALIFORNIA AMENDATORY ENDORSEMENT

**You** and **We** agree:

1. PART 7. GENERAL CONDITIONS, I. **Cancellation** is deleted and replaced by the following:

I. **Cancellation**

1. The First **Named Insured** may cancel this Policy by mailing or delivering to **Us** or **Our** authorized representative advance written notice of cancellation.

2. If this Policy has been in effect for less than sixty (60) days and is not a renewal with **Us**, **We** may cancel this Policy by mailing or delivering to the First **Named Insured** written notice of cancellation at least:

   a. Ten (10) days before the effective date of cancellation if **We** cancel for failure to pay the premium when due or for fraud; or

   b. Thirty (30) days before the effective date of cancellation if **We** cancel for any other reason.

3. If this Policy has been in effect for more than sixty (60) days, or if it is a renewal with **Us**:

   a. **We** may cancel this Policy by mailing or delivering to the First **Named Insured**, and the agent of record, written notice of cancellation at least:

      (1) Ten (10) days before the effective date of cancellation if **We** cancel for failure to pay the premium when due; or

      (2) Sixty (60) days before the effective date of cancellation if **We** cancel for any other reason; and

   b. **We** may cancel only for the following reasons:

      (1) Nonpayment of any premium when due;

      (2) A judgment by a court or an administrative tribunal that the **Named Insured** has violated any law of this state or the United States having as one (1) of its necessary elements an act that materially increases any of the risks insured against;

(3) Discovery of fraud or material misrepresentation by **You** or **Your** representative in obtaining coverage, or by the **Named Insured** or its representative in pursuing a **Claim** under the Policy;

(4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the **Named Insured** or its representative, which materially increase any of the risks insured against;

(5) Failure by the **Named Insured** or its representative to implement reasonable loss control requirements which were agreed to by **You** as a condition of policy issuance or which were conditions precedent to use by **Us** of a particular rate or rating plan, if the failure materially increases the risks insured against;

(6) A determination by the commissioner that the loss of, or changes in, reinsurance covering all or part of the risk would threaten **Our** financial integrity or solvency;

(7) Determination by the commissioner that a continuation of the Policy would place **Us** in violation of laws of this state or **Our** state of domicile or that the continuation of coverage would threaten **Our** solvency;

(8) A change by the **Named Insured** or its representative in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or materially changed risk, unless the added, increased, or changed risk is included in the Policy.

**We** will mail or deliver **Our** notice to the address stated in Item 1. of the Declarations Page.

Notice of cancellation will state the effective date of cancellation and it will include the reason(s) for cancellation. The **Policy Period** will end on that date.

If this Policy is canceled, **We** will send the First **Named Insured** any premium refund due and the refund will be pro rata. The cancellation will be effective even if **We** have not made or offered a refund.

If notice is mailed, proof of mailing will be sufficient proof of notice.

2. **PART 7. GENERAL CONDITIONS, J. Nonrenewal** is deleted and replaced by the following:

**J. Nonrenewal**

1. **We** may elect to nonrenew this Policy by mailing or delivering to the First **Named Insured**, and the agent of record, written notice of nonrenewal at least sixty (60) days, but not more than one hundred twenty (120) days, before the Expiration Date if **We** intend not to renew the Policy, or to condition renewal upon a reduction of the Limit of Liability, elimination of coverages, increase in Retention, or increase of more than 25% in the rate upon which the premium is based. **We** will mail or deliver **Our** notice to the last known address of the First **Named Insured.** The notice shall include the reason for such non-renewal.

2. A notice of nonrenewal shall not be required in the event:

a. Of the transfer of, or renewal of, the Policy without a change in its terms or conditions or the rate on which the premium is based between insurers that are members of the same insurance group;

b. The Policy has been extended for ninety (90) days or less and the notice required in J.1. above has been given prior to the extension;

c. The First **Named Insured** has obtained replacement coverage or has agreed, in writing, within sixty (60) days of the termination of the Policy, to obtain that coverage;

d. The Policy is for a period of no more than sixty (60) days and **You** are notified at the time of issuance that it may not be renewed;

e The First **Named Insured** requested a change in the terms or conditions or risks covered by the Policy within sixty (60) days before the Expiration Date; or

f. **We** have made an offer, at least sixty (60) days before the Expiration Date, to renew the Policy under changed terms or conditions or at a changed premium rate. As used in this provision, "terms and conditions" includes, but is not limited to a reduction in the Limit of Liability, elimination of coverages, or an increase in Retention.

If **We** offer to renew this Policy at less favorable terms and conditions, including a reduction in limits, elimination of coverages, an increase in Retention, or at an increase of more than 25% in the rate upon which the premium is based, such less favorable terms will take effect on the renewal date if **We** have given **You** notice of the change(s) in terms at least sixty (60) days before the Expiration Date.

If **We** have not given **You** such advance notice, then the First **Named Insured** may cancel the renewal Policy within sixty (60) days after the date notice was given by **Us** and **We** will forward the First **Named Insured** any premium refund due and such refund will be pro rata.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of the Policy and takes effect on the effective date indicated below.

Effective date of this endorsement: October 2, 2008

If this endorsement is issued as part of the Policy on the Effective Date shown in the Declarations Page, then the countersignature on the Declarations Page also applies to this endorsement. If this endorsement is not issued with the Policy or takes effect after the Effective Date of the Policy, an Authorized Representative of the Insurer must countersign in the space below to validate the endorsement.

By:______________________________

Authorized Representative

# EXHIBIT B

PHIL WOOG, ESQ. (State Bar No. 134323)
MATTHEW R. PAHL (State Bar No. 227334)
**COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
A Professional Corporation
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977
Telephone: (714) 431-1100
Facsimile: (714) 431-1119

Attorneys for Plaintiff,
DATA IMPACT, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

DATA IMPACT, INC., a Delaware corporation,

Plaintiff,

v.

SRI IIST, INC., a Florida corporation; RT IMAGING, LLC, a Florida limited liability company; DGVAULT, INC., a Texas corporation; DI IMAGING, INC., a California corporation; CROWN TECHNOLOGY ASSISTED BUSINESS SERVICES CORPORATION, a California corporation; NATARAJAN RAMAMURTHY, an individual; STEVE KING, and individual; AMANDA POWELL, an individual; DR. JOHN F. TANNER, JR., an individual; and DOES 1-100, inclusive,

Defendants.

Case No.: 30-2009-00119746

(Case assigned to Hon. Judge Daniel J. Didier, Dept C20)

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**

1. **Violation of California Uniform Trade Secrets Act;**
2. **Violation of California Penal Code § 502;**
3. **Breach of Contract (Violation of King Non- Disclosure Agreement and King/DI Sales Agreement);**
4. **Breach of Contract (Violation of IMS Agreements);**
5. **Intentional Interference with Contract;**
6. **Intentional Interference with Contract;**
7. **Intentional Interference with Contract;**
8. **Intentional Interference with Prospective Economic Advantage;**
9. **Breach of Fiduciary Duty;**
10. **Unfair Competition; and**
11. **Unfair and Deceptive Trade Practices;**

**DEMAND FOR JURY TRIAL**

Plaintiff Data Impact, Inc. ("Plaintiff" or "Data Impact") hereby alleges as follows:



COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

CORSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

## STATEMENT OF THE CASE

1. This case involves an elaborate scheme by Data Impact's former employees and subcontractor, either collectively or separately, to (i) misappropriate Data Impact's Trade Secrets (ii) breach and interfere with various contracts between themselves and Data Impact (iii) interfere with Data Impact's contractual relationships with its Customers (iv) wrongfully withhold Data Impact's customers' ("Customers") highly sensitive and confidential "Proprietary Customer Information", (v) compete against Data Impact in violation of numerous written agreements, (vi) access Data Impact's servers without authorization, (vii) steal Proprietary Customer Information from Data Impact, and (vii) solicit business from Data Impact's Customers through deceptive advertisement and the use of stolen Proprietary Customer Information and knowledge regarding Data Impact's Trade Secrets. Despite Data Impact's efforts to maintain the confidentiality of its Trade Secrets, Defendants, collectively and separately, have misappropriated Data Impact's Trade Secrets, stolen Proprietary Customer Information and diverted opportunities from Data Impact to themselves.

2. These acts were directed at Data Impact to frustrate its business relationships with its Customers and prospective customers and to drive Data Impact out of business. Defendants have violated the CALIFORNIA UNIFORM TRADE SECRETS ACT by willfully and maliciously acquiring, disclosing and using Data Impact's Trade Secrets in direct competition with Data Impact. Defendants have also violated the CALIFORNIA PENAL CODE § 502 by accessing Data Impact's servers, databases and websites without authorization and stealing Proprietary Customer Information maintained on the servers. Data Impact is informed and believes that unless prohibited from doing so, Defendants will continue to engage in unfair and illegal conduct. Data Impact has been and continues to be irreparably harmed, including the actual and potential loss of Customers. If left unchecked, Defendants' actions threaten Data Impact's ability to survive as a company and viably compete in the marketplace.

## PARTIES

3. Plaintiff Data Impact, Inc. is a corporation duly organized and existing under the laws of the State of Delaware. Data Impact's headquarters and principal place of business are located in

the State of California at 5432 Bolsa Avenue, #A, Huntington Beach, California 92649. Data Impact is the parent company and successor in interest to CD-Com Systems, Inc., an Indiana corporation that is not a party to the instant litigation.

4. Defendant SRI IIST, Inc. ("SRI IIST") is a corporation duly organized and existing under the laws of the State of Florida. SRI IIST was incorporated on January 7, 2003. Natarajan Ramamurthy is the President and Chief Executive Officer of SRI IIST. SRI IIST's principal place of business is located at 10216 NW 47th Street, Sunrise, Florida.

5. Defendant RT Imaging, LLC ("RT Imaging") is a limited liability company duly organized and existing under the laws of the State of Florida. RT Imaging was formed on December 27, 2007. Natarajan Ramamurthy is a manager, director, or principal of RT Imaging; RT Imaging's principal place of business is located at 10216 NW 47th Street, Sunrise, Florida. SRI IIST does business as RT Imaging.

6. Defendant DI Imaging Inc. ("DI Imaging") is a corporation duly organized and existing under the laws of the State of California. DI Imaging was incorporated on May 17, 2008. Natarajan Ramamurthy is a manager, director, or principal of DI Imaging. DI Imaging is also registered by Defendant Steve King as a fictitious name in the State of California, County of Orange. DI Imaging's principal place of business and Defendant Steve King's residence are located at 9532 Drumbeat Drive, Huntington Beach, CA 92646 ("King's Residence").

7. Defendant DGVault, Inc. ("DGVault") is a corporation duly organized and existing under the laws of the State of Texas. DGVault was incorporated on November 17, 2008. DGVault's principal place of business is 600 Lake Air Drive, Suite IA, Waco, Texas.

8. Natarajan Ramamurthy ("Ram") is, and at all times mentioned herein was, a resident of the State of Texas. Ram's business address is 600 Lake Air Drive, Suite IA, Waco, Texas. Ram is a principal, manager, investor, or owner of Defendants SRI IIST, RT Imaging, DGVault, and/or DI Imaging. SRI IIST, RT Imaging, DI Imaging, DGVault are collectively referred to herein as "Ram's Enterprise."

9. Defendant Steve King ("King") is now, and at all times mentioned herein was, a

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

resident of the State of California. At all times relevant hereto, King has resided at King's Residence. Until March 31, 2008, King was Data Impact's Vice President of Sales and a senior manager of the company. In this position, King was responsible for sales and service to Data Impact's Customers. King is also a shareholder of Data Impact's stock. From April 1, 2008 to January 5, 2009, King acted as an independent sales representative of Data Impact pursuant to the terms of a written "Sales Representative Agreement" with Data Impact. King is a principal, manager, investor, owner or employee of DI Imaging and/or C-TABS (defined below).

10. Defendant Amanda Powell ("Powell") is now, and at all times mentioned herein was, a resident of the State of California. From September 2006 until January 5, 2009, Powell was a Sales Executive for Data Impact, and between October 2008 and January 5, 2009 was an Account Management Consultant. In this position, Powell was responsible for sales and service to Data Impact's customers. To properly and adequately service Data Impact's Customers, Powell was necessarily provided limited access to Data Impact's proprietary and trade secret information, including, but not limited to, the Customer List, Customer Records, Proprietary Customer Information, and Software Trade Secret (collectively referred to as "Data Impact's Trade Secrets"). Powell is an employee of DI Imaging and/or C-TABS (defined below).

11. Defendant Dr. John F. Tanner ("Tanner") is a founding member of RT Imaging and a principal, manager, investor, owner or employee of DGVault and SRI IIST. He is a resident of the State of Texas and professor in the Business Department of Baylor University.

12. Defendant Crown Technology Assisted Business Services Corporation ("C-TABS") is a corporation duly organized and existing under the laws of the State of California. C-TABS was incorporated on January 6, 2009. C-TABS's principal place of business is King's Residence. C-TABS also conducts business as DI Imaging.

13. Jurisdiction and venue is proper with this Court as: (1) Defendants reside in or are doing business in this judicial district; and (2) a substantial part of the events giving rise to this action occurred in this judicial district and the harm to Plaintiff has occurred in this judicial district.

14. Defendant Ram has spent substantial and significant amounts of time in the State of



535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

California in connection with his business with Data Impact, signed contracts in California between members of Ram's Enterprise and Data Impact, entered into contracts which contained California choice of law provisions, engaged in tortious conduct either within or without the State of California which caused harm to Data Impact in the State of California, accessed Data Impact's servers located in the State of California without authorization and stole Proprietary Customer Information from the servers, and breached contracts within or without the State of California, which caused harm to Data Impact within the State of California.

15. Data Impact is informed and believes, and thereon alleges, that Does 1 through 100, inclusive, are the partners, agents, employees or principals, and the co-conspirators of the named Defendants, and of each other; that the named Defendants and Does 1 through 100, inclusive, performed the acts and conduct herein alleged, aided and abetted the performance thereof, or knowingly acquiesced in, ratified, and accepted the benefits of such acts and conduct; and that therefore Does 1 through 100, inclusive, are liable to Data Impact to the extent of the liability of the named Defendants.

16. Data Impact is informed and believes, and thereon alleges, that at all times herein mentioned each of the Defendants was the agent, servant and/or employee of each of the other Defendants, and in connection with the matters hereinafter alleged, was acting within the scope of such agency and/or employment, and each Defendant ratified each and every act, omission and thing done by each and every other Defendant herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. Data Impact's Business

#### i. Software Trade Secret

17. Data Impact conducts business in the electronic commerce industry. The electronic commerce industry comprises several sectors: (i) conversion of documents and other information to electronic format; (ii) organization, indexing, management and access to electronic information; (iii) presentment of electronic information and/or invoices; and (iv) payment of invoices. Of these, the primary presentment and payment sectors deal with consumer-interfacing services, as opposed to

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

business-to-business services.

18. Business in the electronic commerce industry generally, and business for Data Impact specifically, is conducted largely through electronic media. This includes customer solicitation and communication, training, access to products and services, troubleshooting, and research and development.

19. Since 1994, Data Impact has spent over fifteen (15) years developing a business-to-business comprehensive software program that integrates all sectors of the electronic commerce industry by providing its Customers with a full service product, flexible enough to be tailored to each Customer, and thereby alleviating the need for the Customer to obtain the services from several different companies (the "Software Trade Secret"). The Software Trade Secret is a proprietary and uniquely distinct collective suite of technology with accompanying business processes and methodology which combines the following functions in a manner to serve Data Impact's Customers' unique needs. Data Impact's Software Trade Secret takes Customer Records and Proprietary Customer Information and provides customers the ability to:

(a) Index, input, compress, encrypt, store, manage, manipulate, and access the Customer Records as desired by each Customer;

(b) Present invoices or other Customer Records to their Customers for payment or other uses; and

(c) Collect, record and manage accounts receivable, and payment.

20. The Software Trade Secret operates at an extremely high speed and functionality to allow Data Impact's Customers to store large amounts of information and to query the software for a specific set of Proprietary Customer Information and obtain virtually immediate results, no matter how many records are encompassed by or responsive to the query. Data Impact is aware of only a few other companies in the country that have integrated all sectors of the electronic commerce industry (albeit without the same speed or functionality of the Software Trade Secret). Data Impact's Customers utilize some or all of the Software Trade Secret' functions.

21. Data Impact has spent millions of dollars to develop the Software Trade Secret. Its

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

efforts include retaining business advisors and others with expertise in a variety of fields, acquiring businesses in order to develop and market the Software Trade Secret and investing in ongoing technology research and development to stay at the forefront of this developing industry. Data Impact's ongoing investment includes a research and development team of both Data Impact employees and third-party developers, at a cost in excess of $225,000 per month, to ensure that the Software Trade Secret continues to perform efficiently and effectively for its Customers.

22. Data Impact goes to great lengths to protect the secrecy of the Software Trade Secret, including entering into confidentiality and non-disclosure agreements with its employees, vendors, and Customers. The computer code for the Software Trade Secret is protected by several layers of servers in a secured code repository. Data Impact maintains the secrecy of the code for the Software Trade Secret by limiting access to only those with an absolute need, such as appropriate technical support team members. No one person has complete access to all components of the code.

23. None of the Defendants were provided access to the computer code for the Software Trade Secret. The code for the Software Trade Secret cannot be accessed from any of Data Impact's network drives. The code for the Software Trade Secret is not generally known in the industry, nor is it shared with anyone outside of Data Impact. Within Data Impact, the code is shared only with those with a need to know it.

24. The Software Trade Secret cannot be readily discovered by independent invention, accidental disclosure or reverse engineering without involving considerable time, effort and expense. The Software Trade Secret has a significant economic value to Data Impact that would be lost if not for its secrecy. The Software Trade Secret would have a significant economic value to Data Impact's competitors if made known to or acquired by them.

25. The Software Trade Secret constitutes trade secrets entitled to protection under the CALIFORNIA UNIFORM TRADE SECRETS ACT.

**ii. Customer List**

26. Data Impact maintains a list of its Customers' contact information, data and other pertinent information regarding each Customer's requirements (the "Customer List"). Over sixty-

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

five percent (65%) of Data Impact's Customers have been with the company for greater than five (5) years. The Customer List also includes leads for potential new business.

27. Data Impact has spent millions of dollars and its entire existence to develop the Customer List. Data Impact continues to spend time and money to refine and expand the Customer List. Data Impact goes to great lengths to protect the secrecy of the Customer List, including entering into confidentiality and non-disclosure agreements with its employees and storing the Customer List in a secured management tool provided by pipelinedeals.com ("Pipeline").

28. Data Impact's employees are provided with usernames and passwords to access the Customer List at Pipeline. The employees' access is limited to only those Customers which each employee services.

29. Powell, as with other employees, was only provided with usernames and passwords to access only those Customers' information that she serviced while employed by Data Impact. King and Powell did not have the same scope of access to the Customer List.

30. The Customer List is not known outside of Data Impact. The Customer List cannot be readily discovered by independent invention, accidental disclosure or reverse engineering without involving considerable time, effort and expense. The Customer List has a significant economic value to Data Impact that would be lost if not for its secrecy. The Customer List would have a significant economic value to Data Impact's competitors if it is made known to or acquired by them.

31. The Customer List constitutes a trade secret entitled to protection under the CALIFORNIA UNIFORM TRADE SECRETS ACT.

**iii. Customer Records and Proprietary Customer Information**

32. To utilize Data Impact's services, Customers are required to provide Data Impact with vast amounts of highly confidential and sensitive information. This information includes business information for the Customers' clients such as account information, but it may also include, depending on the Customer's needs, credit card numbers, individual social security numbers, and/or personal medical information. This "raw data" ("Customer Records") is provided to Data Impact in paper format, in micro-graphic media and/or digitally.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

33. If provided in paper format, the first step in Data Impact's service is to prepare and scan the Customer Records, and all Customer Records would be indexed and electronically tagged per Data Impact's proprietary process and directions. ("Digital Processing Services"). These Digital Processing Services transformed the Customer Records into usable digital media ("Proprietary Customer Information") ready to coordinate with Data Impact's other processes. The Proprietary Customer Information is then uploaded into Data Impact's main database and the Trade Secret Software is used to provide Customer access as specified in the Customer's agreement with Data Impact.

34. Data Impact's Customers also provide detailed information regarding their specific business processes. Data Impact is then able to use this information along with the Customer Records and Proprietary Customer Information to conform and tailor the Software Trade Secret to each specific Customer's requirements.

35. Due to this interaction of the unique Digital Processing Services, confidential Customer Records, Proprietary Customer Records, and unique Software Trade Secret to produce individual services for each Customer, Data Impact has taken steps to ensure confidentiality among its employees, vendors, and customers.

36. Data Impact's unique compilation of Digital Processing Services, Customer Records, Proprietary Customer Records and the Software Trade Secret constitutes a trade secret entitled to protection under the CALIFORNIA UNIFORM TRADE SECRETS ACT, and, collectively with the Software Trade Secret and Customer List is hereinafter referred to as "Data Impact's Trade Secrets."

**B. King and Powell**

37. During the course of his employment and subsequently while he was under contract as a sales representative, King agreed to and executed a Non-Disclosure Agreement with Data Impact ("King Non-Disclosure Agreement").

38. Pursuant to the King Non-Disclosure Agreement, King agreed that:

> [D]uring the term of employment with the Company, Employee will not, directly or indirectly, as an employee, officer, director, partner,

COURSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

joint venture, shareholder, investor, consultant or in any other capacity provide or offer to provide any product or service that competes with those of the Company in any manner, in any geographic region where the Company distributes, provides or markets its products and/or services.

39. In addition to the King Non-Disclosure Agreement, King acknowledged receipt of and agreed to abide by and follow Data Impact's policies and procedures as contained in the Data Impact Employee Handbook.

40. Powell also signed an acknowledgement that she received the Employee Handbook.

41. Among the policies contained in the Handbook that King and Powell acknowledged and agreed to follow the Confidentiality of Company and Customer Information. This policy provides, in part, that: "No employee is to discuss, disclose, copy or in any way share or make use of any customer information for any purpose . . . ."

42. On January 5, 2009, Powell voluntarily terminated her employment with Data Impact and immediately began working for DI Imaging and C-TABS in direct competition with Data Impact.

**C. Ram and Ram's Enterprise**

43. In or about 2007, Data Impact decided to outsource their Digital Processing Services. At that time, Ram's company, SRI IIST, which was doing business as RT Imaging, provided Data Processing functions to customers.

44. On November 20, 2007, Data Impact and SRI IIST executed a Services Agreement pursuant to which SRI IIST would act as Data Impact's subcontractor and provide Digital Processing Services to Data Impact's Customers in Florida ("FL Services Agreement"). The FL Services Agreement was executed on SRI IIST's behalf by Ram as the President and CEO of SRI IIST. The FL Services Agreement is the subject of the Illinois Litigation and Data Impact does not seek any relief related to the FL Services Agreement in this action.

45. On March 31, 2008, Data Impact and SRI IIST executed a Services Agreement

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

pursuant to which SRI IIST would provide Digital Processing Services to Data Impact's Customers in California ("CA Services Agreement"). During negotiations and thereafter, Data Impact specifically and intentionally refrained from disclosing any information concerning the Software Trade Secret to Ram, SRI IIST or RT Imaging because Ram, SRI IIST and RT Imaging would not be providing the Software Trade Secret to Data Impact's Customers and, therefore, did not need to know Data Impact's Trade Secrets. Rather, SRI IIST and RT Imaging were to provide only Digital Processing Services to certain of Data Impact's Customers.

46. Section 12 of the CA Services Agreement provides, in pertinent part, that SRI IIST agreed that during the term of the CA Services Agreement, it would not "on its own behalf or on behalf of any other person or entity, in any capacity whatsoever, directly or indirectly, provide any Subject Services to any 'Customer' (as defined below) except pursuant to this Agreement." A true and correct copy of the CA Service Agreement is attached hereto as Exhibit "A".

47. Section 10 of the CA Services Agreement generally provides that Data Impact agreed to sublet its facilities located at 5412 Bolsa Avenue, Unit A, Huntington Beach, California to SRI IIST for use in the operation of SRI IIST and RT Imaging.

48. Thereafter, SRI IIST began performing under the CA Services Agreement, billing for its services as RT Imaging using Ram's business address of 600 Lake Air Drive, Suite lA, Waco, Texas.

49. King, Powell, Tanner, and Ram had knowledge of the CA Services Agreement.

50. On February 12, 2009, SRI IIST abandoned the subleased facilities without providing notice to Data Impact. On the same day, Ram gave notice that SRI IIST was terminating its CA Services Agreement and FL Service Agreement with Data Impact effective immediately.

**D. King's Agreements with Data Impact and SRI IIST**

51. On March 31, 2008, on the same day that Data Impact and SRI IIST executed the CA Services Agreement, King left the employ of Data Impact to act as an independent sales representative for several companies, including Data Impact. King and Data Impact entered into a Sales Representative Agreement whereby King would sell Data Impact's products, for a

commission, paid as a percentage of sales made by King (the "King/DI Sales Agreement"). The King/DI Sales Agreement included a restrictive covenant whereby King agreed that during the term of his employment he would not "engage, contact or solicit any Customer [of Data Impact], on his own behalf or the behalf of any other company or individual, for the purpose of selling electronic services that are the same or similar as the Products sold by Representative to such Customer."

52. King also agreed to "not disclose any Confidential Business Information or trade secrets . . . of the Company to any entity or person outside of the Company . . . ." King further agreed to not use Confidential Business Information except to discharge his duties and obligation under the Agreement. Confidential Business Information is defined as "all business, sourcing, marketing, and distribution information regarding or affecting the Company which the Representative receives, becomes aware of, conceives, or develops as a direct or indirect result of its relationship with the Company." A true and correct copy of the King/DI Sales Agreement is attached hereto as Exhibit "B".

53. Data Impact is informed and believes that King left its employ at the urging of Ram for the express purpose of assisting Ram, Tanner, and Ram's Enterprise compete with Data Impact by disclosing to Ram, Tanner, and Ram's Enterprise Data Impact's Trade Secrets and other proprietary information.

54. Also on March 31, 2008, in part for the purpose of furthering their scheme to unlawfully compete with and unbeknownst to Data Impact, King entered into a Consulting Agreement with SRI IIST whereby King agreed to "provide sales and marketing services" to SRI IIST (the "King/SRI Consulting Agreement"). Data Impact is informed and believes that Ram paid King a monthly salary in excess of $10,000 for services rendered under the King/SRI Consulting Agreement.

55. Thereafter, King assigned the King Sales Agreement to DI Imaging on April 9, 2008.

56. On January 5, 2009, King provided notice to Data Impact that he was terminating the King/DI Sales Agreement. Pursuant to the King/DI Sales Agreement, thirty (30) days notice is required for termination. The King Sales Agreement's effective termination date is February 4,

COURSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

2009.

57. Data Impact is informed and believes that King, Ram and SRI IIST continue to conduct business pursuant to the King/Ram Consulting Agreement or some form of agreement similar to the Consulting Agreement.

**E. Data Impact's Customer Confidentiality Agreements**

58. Upon entering into an agreement to provide information management services to its Customers, Data Impact and each Customer execute an Information Management Services Agreement ("IMS Agreement"). A true and correct copy of an IMS Agreement between Data Impact and Holt of California, Data Impact's now former Customer, is attached hereto as Exhibit "C". The IMS Agreement contains specific agreements between the parties regarding the trade secrets, proprietary information, and intellectual property of Data Impact. Upon entering into the IMS Agreement, the Customer:

> Acknowledges and agrees that the processes, procedures and software underlying the Services constitute valuable proprietary products and trade secrets belonging to Data Impact and embody substantial creative efforts, confidential information, ideas and expressions. As a result, [the Customer] shall not, and shall not allow any of its officers, employees, agents, or independent contractors to, decompile, disassemble or reverse engineer any product or software delivered to [the Customer] in connection with the Services.

59. As sales representatives of Data Impact, King and Powell were aware of the IMS Agreements, and had, in fact, executed them on behalf of Data Impact. King and Powell were aware of the strict confidentiality terms regarding the Software Trade Secret and Proprietary Information contained in the IMS Agreements.

**F. Defendants Unauthorized Access to and Theft from Data Impact**

60. Data Impact is informed and believes that Ram, Tanner, and Ram's Enterprise implemented a plan to raid Data Impact's employees and to misappropriate Data Impact's Trade

COUSSET, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

Secrets. After November 2007 and prior to March 31, 2008, SRI IIST and RT Imaging through and by Ram, in order to perpetrate their scheme, contacted King, among other former Data Impact employees, with the express purpose of eliciting information concerning Data Impact's Trade Secrets.

61. As part of the scheme to illegally exploit Data Impact's confidential and proprietary information, King and Powell aided and abetted Ram, Ram's Enterprise and each other's illegal conduct by violating the King Non-Disclosure Agreement, the Data Impact Employee Handbook, the King/DI Sales Agreement and the CA Services Agreement.

i. **King and Powell.**

62. While Powell was still employed by Data Impact, King, on behalf of himself, Ram or Ram's Enterprise, contacted Powell for the express purpose of soliciting her for employment with DI Imaging and C-TABS, to compete directly with Data Impact by using Data Impact's Trade Secrets.

63. Prior to her leaving Data Impact's employment, Powell removed files and information from the physical files for several of her customer accounts and took said file material with her when she left Data Impact. Powell also deleted various email correspondence from her email account that pertained to the management of her Data Impact customer accounts.

64. Beginning no later than January 6, 2009, Powell repeatedly accessed Data Impact's servers, without authorization, and reviewed the databases and websites maintained by Data Impact on behalf of its customers. Data Impact is informed and believes that Powell accessed Data Impact's servers, customer databases and Proprietary Customer Information, for the express purpose of stealing Data Impact's Trade Secrets to assist King, Ram and Ram's Enterprise in their solicitation of Data Impact's Customers in violation of various agreements and the Data Impact Employee Handbook.

65. Beginning no later than January 18, 2009, King repeatedly accessed Data Impact's servers, without authorization, and reviewed the databases and websites maintained by Data Impact on behalf of its customers. Data Impact is informed and believes that King accessed Data Impact's servers, customer databases and Proprietary Customer Information, to steal Data Impact's Trade

COURSEY, TOOLEN, GAGE, DUFFY & WOOD
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

Secrets and assist Ram and Ram's Enterprise to solicit Data Impact's Customers.

66. By accessing the servers, King and Powell obtained information regarding the structure of the websites designed for certain customers use in conjunction with the Software Trade Secret, along with knowledge regarding Data Impact's Trade Secrets. This enabled King, Powell, Ram or Ram's Companies to design similar databases and websites to unlawfully solicit those customers to conduct business with King, Powell and the other Defendants rather than Data Impact.

67. After accessing and viewing the databases and websites, King and Powell exported and stole Data Impact's Trade Secrets, including Proprietary Customer Information maintained by Data Impact on its servers.

68. Powell reviewed and stole Proprietary Customer Information related to Data Impact's Customers Peterson, Holt Caterpillar ("Holt"), Fluid Master and Tony's Fine Foods.

69. King reviewed and stole Proprietary Customer Information related to Data Impact's Customers Fluid Master, Tony's Fine Foods, Johnson Machinery, Peterson, First American SMS Escrow Company ("First American") and Calmet.

70. Data Impact is informed and believes that King and Powell disclosed Data Impact's Trade Secrets and Proprietary Customer Information to Ram and Ram's Enterprise for use in conjunction with a software suite similar to the Software Trade Secret, developed by DGVault, to solicit and service Data Impact's Customers.

**ii. Ram.**

71. Beginning no later than January 20, 2009, Ram repeatedly accessed Data Impact's servers, without authorization, and reviewed the databases and websites maintained by Data Impact on behalf of its customers. Data Impact is informed and believes that Ram accessed Data Impact's servers, customer databases and Proprietary Customer Information, for the express purpose of stealing Data Impact's Trade Secrets to solicit Data Impact's Customers in furtherance of the King/SRI Consulting Agreement and in violation of the CA Services Agreement.

72. After accessing and viewing the databases and websites, Ram exported and stole Data Impact's Trade Secrets and Proprietary Customer Information maintained by Data Impact on its

COBASET, TOOLEN, GAGE, DUFFY & WOOD
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

servers for Data Impact's Customers Holt, First American and Calmet, and perhaps others.

**iii. Data Impact's Customers' requests for back-up copies of Proprietary Customer Information**

73. Data Impact is informed and believes that King, Powell, DI Imaging, and C-TABS encouraged former Data Impact Customers to request back-up copies of Proprietary Customer Information stored on Data Impact's servers, including but not limited to Holt, Andronico's Market, and Johnson Machinery. These Customers had previously entered into IMS Agreements with Data Impact.

74. Data Impact is informed and believes that in response to King, Powell, DI Imaging and C-TABS' suggestions, Data Impact's Customers requested and received back-up copies of their Proprietary Customer Information from Data Impact.

75. Data Impact is informed and believes that the former Data Impact Customers have provided the back-up copies of Proprietary Customer Information to Defendants for use in a similar software suite built by Defendants and marketed by DGVault to unlawfully compete with Data Impact.

76. Data Impact is informed and believes that Ram, Ram's Enterprise, and Tanner used the information obtained by Ram, from King, Powell and others, including Data Impact's Trade Secrets, along with the back-up copies of Proprietary Customer Information requested and provided by Data Impact's former Customers, to engineer and build a similar software suite as Data Impact's Trade Secrets in order to directly compete with Data Impact.

77. Data Impact is informed and believes that Defendants are currently servicing Data Impact's former Customers in violation of the King Non-Disclosure Agreement, the King/DI Sales Agreement and the CA Services Agreement.

**G. King and Powell's Use of Stolen, False and Misleading Information to Solicit Data Impact's Customers**

78. Unbeknownst to Data Impact, in or about May 2008 and continuing until the filing of this First Amended Complaint, King on behalf of and in concert with Ram, Tanner, and Ram's

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

Enterprise has solicited Data Impact's Customers by using Data Impact's Trade Secrets and Data Impact's confidential and proprietary information, including customer contacts, pricing, and internal correspondence and e-mails. King, DI Imaging, and C-TABS advised each Customer that they could significantly reduce the Customer's costs for data processing and management. King could only have known how to contact these customers, their current needs, and their rates with Data Impact by using the confidential and proprietary information he had acquired and stolen from Data Impact.

79. There is no business connection, either actual or implied, between Data Impact and DI Imaging.

80. Data Impact is informed and believes that the name "DI Imaging" was chosen by King and Ram due to its similarity to Data Impact. In or about May of 2008, King began soliciting customers on behalf of Ram and Ram's Enterprises under the guise that DI Imaging had somehow split off of Data Impact. King advised Ram in an email that "there is name identification with Data Impact. I have tested the waters, and it has become apparent the story of the split of the two companies, Data Impact and DI Imaging has been understood by the existing clients which will allow me to network those relationships." King further advised Ram, in reference to a client solicited by DI Imaging, that hopefully "[the clients] understand we are the imaging off-shoot of Data Impact."

81. Between January 23, 2009 and February 13, 2009, Data Impact repeatedly advised Powell of her obligations to refrain from accessing and using Data Impact's Trade Secrets.

82. Between January 23, 2009 and February 13, 2009, Data Impact repeatedly advised King of his obligations to refrain from accessing and using Data Impact's Trade Secrets.

83. On or about February 16, 2009, in a letter to Ram by Data Impact's attorneys, Data Impact specifically requested that Ram and Ram's Enterprise: (a) return to Data Impact all confidential information Ram and related entities previously obtained, including documents, data, forms, and customers' documents and forms; (b) cease and desist from contacting Data Impact's customers; (c) honor its contractual obligations to Data Impact; and (d) refrain from further

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

COBLENTZ, PATCH, DUFFY & BASS LLP
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

interference with Data Impact's Customers and business. Ram and Ram's Enterprise have not responded to this letter or honored Data Impact's requests.

84. Also on or about February 16, 2009, Ram sent letters to many of Data Impact's Customers. These letters wrongfully solicit Data Impact's Customers' business, falsely stating that Data Impact was "in serious violation of the Services Agreements", which were being terminated as a result of Data Impact's "violation of the contract terms", and that SRI IIST could "provide continuous services" to Data Impact's Customers. Tanner was listed as a point of contact for SRI IIST's services to Data Impact's Customers.

85. In or about February of 2009, Powell, on behalf of DI Imaging, forwarded an email solicitation to customers advising them that DI Imaging was formed by a "founder" of Data Impact.

86. In or about May of 2009, Powell, on behalf of DI Imaging and C-TABS, contacted NC Machinery, a Customer of Data Impact, to solicit business. Powell provided a presentation to NC Machinery wherein she represented that C-TABS had "over a decade of CAT Experience", did business with other CAT dealers, such as Foley Caterpillar ("Foley"), and was a preferred vendor for CAT dealers.

87. C-TABS does not have a decade of experience, and Foley was not a client of C-TABS or DI Imaging at the time. Data Impact is informed and believes that neither DI Imaging nor C-TABS is a preferred vendor for CAT dealers.

88. As a result of Defendants' conduct, Data Impact has lost revenues from customers who have begun to conduct business with Defendants.

89. Data Impact is informed and believes that King, Powell, Tanner, Dr Imaging and Crown Tech are acting in concert with Ram and Ram's Enterprise to solicit and divert Data Impact's Customers by using, disclosing and disseminating Data Impact's Trade Secrets.

///

///

///

///

**FIRST CAUSE OF ACTION**

**(Violation of California Uniform Trade Secrets Act)**

**(Against All Defendants)**

90. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 89, inclusive, as though set forth fully herein.

91. Data Impact has developed and used trade secrets consisting of confidential, proprietary information, including, but not limited to, the Customer List, Proprietary Customer Information and the Software Trade Secret to serve Data Impact's Customers. Data Impact's profits are, in large measure, driven by the specialized handling of its Customers' accounts through its proprietary Trade Secrets, and, in particular, providing targeted services for each Customer's data and document management.

92. Data Impact developed and created its Trade Secrets through substantial expenditure of time, energy and money. Data Impact achieved substantial business advantage from developing this trade secret information.

93. Data Impact's Trade Secrets derive actual and potential independent economic value from not being generally known to the public, to its competitors, or to its potential competitors, and Defendants could and did obtain economic value from the wrongful disclosure and use of this information.

94. Data Impact has taken all reasonable efforts to maintain and preserve the confidentiality of its Trade Secrets, including, among other things, requiring: (a) King to sign the King Non-Disclosure Agreements; (b) King and Powell to acknowledge receipt of the Employee Handbooks; (c) King to sign the King/DI Sales Agreement; (d) Ram, SRI IIST and RT Imaging to sign the CA Services Agreement; and (e) its Customers to execute the IMS Agreements. All Defendants therefore had a duty to maintain the secrecy of Data Impact's Trade Secrets.

95. King and Powell misappropriated Data Impact's Trade Secrets by willfully and maliciously providing Data Impact's Trade Secrets to Ram, Tanner and Ram's Enterprise. Data Impact is informed and believes, and based thereon alleges, that Defendants knew that Data Impact's

COURSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

Trade Secrets were protected trade secret information belonging to Data Impact and knowingly used such misappropriated information to compete with Data Impact by soliciting Data Impact's Customers. Data Impact is also informed and believes, and based thereon alleges, that Defendants have derived financial and economic benefit from the disclosure of Data Impact's Trade Secrets.

96. Ram, Tanner and Ram's Enterprise misappropriated Data Impact's Trade Secrets by willfully and maliciously soliciting King to provide them with Data Impact's Trade Secrets. King, Powell and Ram also misappropriated Data Impact's Trade Secrets by repeatedly accessing Data Impact's servers, without authorization, to obtain information regarding Data Impact's Trade Secrets and to steal Proprietary Customer Information stored on Data Impact's servers.

97. As a direct and proximate result of Defendants' conduct, Data Impact has suffered, or will suffer, damages to be proven at trial. As a further proximate result of the misappropriation, Defendants were unjustly enriched, although the precise amount of such damage and unjust enrichment is presently unknown and unascertained. Data Impact will seek to amend this Complaint to state the amount of such damages and unjust enrichment when the precise amount becomes known. Alternatively, if the damages and unjust enrichment are not provable, Data Impact seeks damages under *Civil Code* section 3426.3(b).

98. Upon information and belief, Defendants acts were willful and malicious in that, in addition to Defendants above described acts, Defendants accessed Data Impact's servers, without authorization, with the explicit purpose to misappropriate Data Impact's Trade Secrets and to solicit Data Impact's Customers, in violation of their contractual agreements with Data Impact, and interfere with Data Impact's current and prospective relationships with its Customers. Data Impact is informed and believes, and based thereon alleges, that Defendants acted with oppression, fraud, and/or malice, and have deliberately caused and have intended to cause great economic harm to Data Impact with full knowledge of the wrongfulness of their conduct. Data Impact is further informed and believes, and based thereon alleges, that Defendants' conduct as alleged above was despicable, was carried on by Defendants with a willful and conscious disregard for Data Impact's rights, and subjected Data Impact to unjust hardship. Data Impact, therefore, should be awarded punitive and



535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

exemplary damages under *Civil Code* section 3426.3(c) sufficient to punish Defendants for engaging in this conduct and to deter similar conduct on their part in the future.

99. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from using Data Impact's confidential, proprietary and trade secret information.

COBSBY, TOOLEN, GAUG, DUFFY & WOOD
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

**<u>SECOND CAUSE OF ACTION</u>**

**(Violation of California Penal Code § 502)**

**(Against Ram, Powell and King)**

100. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 99, inclusive, as though set forth fully herein.

101. California *Penal Code* § 502(c) provides that "any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external

to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

(9) Knowingly and without permission uses the Internet domain name of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages, and thereby damages or causes damage to a computer, computer system, or computer network.

102. Ram, Powell and King violated California *Penal Code* § 502 by: (a) obtaining and using usernames and passwords provided by Data Impact to its Customers to access Data Impact's servers without authorization; (b) accessing Data Impact's servers, databases and websites without

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

COURSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

authorization; (c) reviewing Proprietary Customer Information stored on Data Impact's servers; and (d) exporting, downloading and otherwise stealing Proprietary Customer Information stored on Data Impact's servers.

103. California *Penal Code* § 502 further provides that "[i]n addition to any other civil remedy available, the owner…of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other relief."

104. As a result of Ram, Powell and King's unauthorized access to and theft from its servers, Data Impact has been damaged in an amount to be proven at trial.

105. Unless and until enjoined by this Court, Ram, Powell and King will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Ram, Powell and King from continuing to violate California Penal Code § 502.

## THIRD CAUSE OF ACTION

**(Breach of Contract—CA Services Agreement)**

**(Against SRI IIST)**

106. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 105, inclusive, as though set forth fully herein.

107. Data Impact has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the CA Services Agreement.

108. Defendant SRI IIST has breached the CA Services Agreement. These breaches include but are not limited to: (i) providing services directly to Data Impact's Customers and

prospective customers, rather than pursuant to the terms of the CA Services Agreement; (ii) willfully and maliciously misappropriating Data Impact's Trade Secrets; (iii) disclosing Data Impact's Trade Secrets to Ram's Enterprise; (iv) using Data Impact's Trade Secrets in the operation of Ram's Enterprise, including DGVault; (v) using Data Impact's Trade Secrets to provide services directly to Data Impact's Customers; and (vi) abandoning the leasehold without notice pursuant to the terms of the agreement.

109. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact for which damages would not afford adequate relief, in that that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from continuing to breach the CA Services Agreement.

110. As a result of Defendants' breaches of the CA Services Agreement, Data Impact has been damaged in an amount to be proven at trial.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

**FOURTH CAUSE OF ACTION**

**(Breach of Contract—**

**King Non-Disclosure Agreement and King/DI Sales Representative Agreement)**

**(Against King)**

111. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 110, inclusive, as though set forth fully herein.

112. Data Impact has performed all conditions, covenants and promises required on its part to be performed in accordance with the King Non-Disclosure Agreement and King/DI Sales Representative Agreement.

113. Data Impact is informed and believes, and thereon alleges, that Defendant King breached the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement by,

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

*inter alia*, entering into the King/SRI Consulting Agreement based upon Data Impact's trade secrets, including but not limited to Data Impact's trade secrets concerning its customers and marketing, future business plans, the Customer List, Software Trade Secret, and present operations of Data Impact's business. King also breached the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement by misappropriating Data Impact's trade secrets and providing services for Data Impact's current and former customers in direct competition with Data Impact.

114. Data Impact does not seek to foreclose King from competing with Data Impact. The King Non-Disclosure Agreement does not prevent King from attempting to obtain the patronage of anyone other than Data Impact's Customers and prospective customers through use of confidential information.

115. Unless and until enjoined by this Court, King will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining King from continuing to breach the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement.

116. As a result of King's breach of the King Non-Disclosure Agreement and King/DI Sales Representative Agreement, Data Impact has been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Intentional Interference with Contract—**

**King Non-Disclosure Agreement and King/DI Sales Representative Agreement)**

**(Against Ram, Ram's Enterprise, Tanner, and Powell)**

117. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 116, inclusive, as though set forth fully herein.

118. Data Impact entered into the King Non-Disclosure Agreement and King/DI Sales

Representative Agreement.

119. Ram, Tanner and the Ram Enterprise had actual knowledge of the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement.

120. Ram, Tanner and the Ram Enterprise induced King to breach the King Non-Disclosure Agreement and King/DI Sales Agreement by: (i) soliciting, communicating and entering into agreements with King, including the King/SRI Consulting Agreement, with respect to the formation and operation of DI Imaging and C-TABS for the purpose of competing directly with Data Impact; (ii) acting in concert with King to solicit and service Data Impact's Customers and prospective customers; (iii) by paying King while King was working for Data Impact; and (iv) inducing King to provide Ram and related entities with proprietary information regarding a competitor.

121. King breached the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement by providing services to Data Impact's Customers and former and prospective customers in direct competition with Data Impact.

122. As a result of Defendants' intentional interference with contract, Data Impact has been damaged in an amount to be proven at trial.

123. The aforementioned acts of Defendants were willful, fraudulent, and malicious. Data Impact is therefore entitled to punitive damages.

124. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from interfering with the King Non-Disclosure Agreement and the King/DI Sales Representative Agreement.

///

**SIXTH CAUSE OF ACTION**

**(Intentional Interference with Contract—CA Services Agreement)**

**(Against All Defendants except SRI IIST)**

125. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 124, inclusive, as though set forth fully herein.

126. Data Impact entered into the CA Services Agreement.

127. Ram, Tanner, Powell, King, RT Imaging, DG Vault, and C-TABS had actual knowledge of the CA Services Agreement.

128. Ram, Tanner, Powell, King, RT Imaging, DG Vault, and C-TABS induced SRI IIST to breach the CA Services Agreement.

129. SRI IIST has breached the CA Services Agreement by: (i) providing services directly to Data Impact's Customers and prospective customers, rather than pursuant to the terms of the CA Services Agreement; (ii) willfully and maliciously misappropriating Data Impact's Trade Secrets; (iii) disclosing Data Impact's Trade Secrets to Ram's Enterprise; (iv) using Data Impact's Trade Secrets in the operation of Ram's Enterprise, including DGVault; (v) using Data Impact's Trade Secrets to provide services directly to Data Impact's Customers; and (vi) abandoning the leasehold without notice pursuant to the terms of the agreement.

130. As a result of Defendants' intentional interference with contract, Data Impact has been damaged in an amount to be proven at trial.

131. The aforementioned acts of Defendants were willful, fraudulent, and malicious. Data Impact is therefore entitled to punitive damages.

132. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Data Impact's business reputation and good will. The exact nature and amount of data Impact's injuries and damages are difficult to ascertain. Defendants' continuing conduct may also generate a multiplicity of lawsuits by Data Impact. Therefore, Data Impact requests that the Court



535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from interfering with the CA Services Agreement.

**SEVENTH CAUSE OF ACTION**

**(Intentional Interference with Contract—Customer IMS Agreements)**

**(Against All Defendants)**

133. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 132, inclusive, as though set forth fully herein.

134. Data Impact entered into IMS Agreements with its Customers.

135. King and Powell had actual knowledge of the IMS Agreements, in part, because they executed many of them on behalf of Data Impact.

136. Data Impact is informed and believes that Ram, Tanner, C-TABS, and Ram's Enterprises were aware of the existence of the IMS Agreements.

137. Defendants induced Data Impact's Customers to breach the IMS Agreements by: (a) soliciting Data Impact's Customers, including, but not limited to Holt of California, Andronico's Market, and Johnson Machinery; (b) requesting that said Customers provide usernames and passwords to access Data Impact's servers; (c) requesting that said Customers provide back-up copies of their Proprietary Customer Information; and (d) receiving copies of said back-up data for use by C-TABS, DI Imaging, and Ram's Enterprises. Further, King, Powell, C-TABS, and DI Imaging have made false and misleading statements to Data Impact's Customers to divert their business away from Data Impact and interfere with the IMS Agreements.

138. As a result of Defendants' intentional interference with contract, Data Impact has been damaged in an amount to be proven at trial.

139. The aforementioned acts of Defendants were willful, fraudulent, and malicious. Data Impact is therefore entitled to punitive damages.

140. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that they would not completely compensate for the

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

injury to Data Impact's business reputation and good will. The exact nature and amount of data Impact's injuries and damages are difficult to ascertain. Defendants' continuing conduct may also generate a multiplicity of lawsuits by Data Impact. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from interfering with the IMS Agreements.

**EIGHTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

**(Against All Defendants)**

141. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 140, inclusive, as though set forth fully herein.

142. Data Impact had existing and on-going business relationships with their customers, including, but not limited to Holt of California, Andronico's Market, and Johnson Machinery. Defendants knew of these relationships and wrongfully and intentionally interfered with these relationships, and thus, interfered with Data Impact's prospective business advantage.

143. Defendants engaged in the following wrongful conduct, among others, to intentionally interfere with Data Impact's prospective business advantage:

(a) Raiding Data Impact's sales employees in order to damage or destroy Data Impact's sales department;

(b) Soliciting Data Impact's employees and inducing defendants King and Powell to breach their fiduciary duties to Data Impact by taking actions, while still employed by Data Impact, to destroy Data Impact's business;

(c) Communicating false and misleading information regarding the experience of DI Imaging and C-TABS in the industry, the business relationship between SRI IIST and Data Impact, and that Data Impact was in "serious violation" of its own contractual relationships;

(d) By capitalizing on the planned confusion between the Data Impact and DI Imaging business names;

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

(e) By inducing Data Impact's customers to breach their own IMS Agreements and confidentiality obligations;

(f) By organizing competing entities and engineering similar software to service Data Impact's prospective customers in direct competition with Data Impact.

144. Data Impact is informed and believes, and based thereon alleges, that each of these actions were undertaken by Defendants with the purpose of expanding their market share in California at Data Impact's expense. Each of these actions constitutes unfair competition in violation of *Business & Professions Code* section 17200.

145. Each of these actions constitutes a deceptive and unfair trade practice in violation of *Business & Professions Code* section 17500.

146. As a proximate result of Defendants' conduct, Data Impact has been damaged in an amount to be proven at trial.

147. The aforementioned acts of Defendants were willful, fraudulent, and malicious. Data Impact is therefore entitled to punitive damages.

148. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that that they would not completely compensate for the injury to Data Impact's business reputation and goodwill. The exact nature and amount of Data Impact's injuries and damages are difficult to ascertain. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from unlawfully interfering with Data Impact's prospective economic advantage.

**<u>NINTH CAUSE OF ACTION</u>**

**(Breach of Fiduciary Duty)**

**(Against King and Powell)**

149. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 148, inclusive, as though set forth fully herein.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

150. At all times during their employment with Data Impact, King and Powell owed Data Impact a fiduciary duty of complete loyalty and fidelity to Data Impact's interests. At all times during their employment by Data Impact, King and Powell were obligated to act solely and exclusively in Data Impact's best interests, and were prohibited from acting in a manner contrary to Data Impact's legitimate business interests.

151. Defendants King and Powell organized competing entities and conspired with Ram and Ram's Companies to unlawfully compete against Data Impact.

152. Defendants King and Powell induced Data Impact's Customers to breach their own confidentiality obligations under the IMS Agreements by inducing them to turn over Proprietary Customer Information.

153. Defendants King and Powell communicated false and misleading information regarding the experience of DI Imaging and C-TABS in the industry, the business relationship between SRI IIST and Data Impact, and that Data Impact was in "serious violation" of its own contractual relationships. King and Powell further capitalized on the intended confusion between the Data Impact and DI Imaging business names in order to solicit new business.

154. As a direct and proximate result of the conduct of Defendants King and Powell, Data Impact has been damaged in an amount to be proven at trial.

155. The aforementioned acts of Defendants King and Powell were willful, fraudulent, and malicious. Data Impact is therefore entitled to punitive damages against each of these Defendants.

**TENTH CAUSE OF ACTION**

**(Unfair Competition)**

**(Against All Defendants)**

156. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 155, inclusive, as though set forth fully herein.

157. Defendants have engaged in unfair competition in violation of California *Business and Professions Code* sections 17200 et seq. by engaging in activities that are unlawful, unfair, and fraudulent. Such actions include, but are not limited to:

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

(a) Illegally raiding Data Impact's employees with the intent to damage or destroy Data Impact's ability to conduct business;

(b) Targeting Data Impact's Customers with the intent to damage or destroy Data Impact's business;

(c) Communicating false and misleading information regarding the experience of DI Imaging and C-TABS in the industry, the business relationship between SRI IIST and Data Impact, and that Data Impact was in "serious violation" of its own contractual relationships;

(d) By capitalizing on the planned confusion between the Data Impact and DI Imaging business names; and

(e) By inducing Data Impact's customers to breach the IMS Agreements by turning over copies of Proprietary Customer Information to Defendants.

158. On information and belief, Data Impact alleges that Defendants' actions were taken with the intent and purpose of destroying Data Impact's business.

159. As a direct and proximate result of Defendants' conduct, Data Impact has been damaged in an amount to be proven at trial.

160. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Data Impact's business reputation and good will. The exact nature and amount of data Impact's injuries and damages are difficult to ascertain. Defendants' continuing conduct may also generate a multiplicity of lawsuits by Data Impact. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from engaging in acts that violate California *Business and Professions Code* sections 17200 et seq.

///

///



COOKSEY, TOOLEN, GAGE, DUFFY & WOSS
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

COURSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

**ELEVENTH CAUSE OF ACTION**

**(Unfair and Deceptive Trade Practices)**

**(Against All Defendants)**

161. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 160, inclusive, as though set forth fully herein.

162. Defendants have engaged in unfair and deceptive trade practices in violation of California *Business and Professions Code* sections 17500 et seq. by engaging in communication that is unfair, false, and misleading, including, but not limited to:

(a) Communicating false and misleading information DI Imaging and C-TABS' experience in the industry;

(b) Communicating false and misleading information regarding DI Imaging and C-TABS market position;

(c) Communicating false and misleading information regarding SRI IIST and Data Impact's business relationship, and that Data Impact was in "serious violation" of its own contractual relationships;

(d) By stating that DI Imaging was a business run by a founder of Data Impact;

(e) By implying and/or directly expressing that DI Imaging was related to or an offshoot from Data Impact; and

(f) Capitalizing on the confusion between Data Impact and DI Imaging.

163. On information and belief, Data Impact alleges that Defendants' actions were taken with the intent and purpose of destroying Data Impact's business.

164. As a direct and proximate result of Defendants' conduct, Data Impact has sustained, and will sustain, damages to be proven at trial.

165. Unless and until enjoined by this Court, Defendants will continue in the acts, conduct, and omissions set forth above, resulting in great and irreparable injury to Data Impact, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to Data Impact's business reputation and good will. The exact nature and amount of data

Impact's injuries and damages are difficult to ascertain. Defendants' continuing conduct may also generate a multiplicity of lawsuits by Data Impact. Therefore, Data Impact requests that the Court issue temporary and preliminary injunctive relief pending trial, and further issue a permanent injunction, restraining and enjoining Defendants from engaging in other acts that violate California *Business and Professions Code* sections 17500 et seq.

**PRAYER FOR RELIEF**

NOW, THEREFORE, Plaintiff prays for relief as follows:

1. For damages according to proof;

2. For temporary emergency preliminary and permanent relief against the Defendants;

3. For restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant(s) as a result of such unlawful business acts or practices;

4. For a civil penalty for each violation;

5. For exemplary and punitive damages in an amount to be determined at trial;

6. For attorneys' fees as allowed by statute and/or the relevant contract provisions and costs of suit;

7. For such other relief as the Court may deem proper.

DATED: June 19, 2009

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

By: ______________________
PHIL WOOG
MATTHEW R. PAHL
Attorneys for Plaintiff,
DATA IMPACT, INC.

///

///

///

535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

# EXHIBIT "A"

**SERVICES AGREEMENT**

**THIS AGREEMENT**, made and entered into effective this 31st day of March, 2008, by and between Sri IIST Inc ("Sri IIST Inc") and **Data Impact, Inc.** ("DI").

**WHEREAS,** Sri IIST Inc is involved in various business activities, including providing its customers with document preparation, data entry, scanning, indexing services and digital film services and

**WHEREAS,** DI is involved in a number of business activities, some of which are the same or similar to those being conducted by Sri IIST Inc; and

**WHEREAS,** DI intends to cease utilizing its own employees and staff in providing its Southern California/Western Region area customers with document preparation, scanning, indexing, data entry and digital film services ("Subject Services"); and

**WHEREAS,** although DI intends to cease utilizing its own equipment and personnel to provide such Subject Services, it intends to continue making such services available to its Southern California/Western Region area customers through the utilization of Sri IIST Inc, as a subcontractor; and

**WHEREAS,** DI has certain items of equipment that it is willing to make available to Sri IIST Inc in furtherance of its plan to subcontract out the Subject Services; and

**WHEREAS,** the parties have been negotiating, and have reached certain agreements whereby Sri IIST Inc will purchase certain equipment (see Exhibit A, Equipment Purchase), from DI so as to allow Sri IIST Inc to provide DI with these services, on a subcontractor basis.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The initial term of this Agreement shall be for a period of three (3) years, commencing on April 7 2008. Thereafter, this Agreement shall be automatically renewed for successive one (1) year periods, unless either party terminates this Agreement by giving written notice of such termination to the other party at least sixty (60) days prior to the expiration of the initial term, or the then current renewal period.

2. Commencing on April 7, 2008, DI agrees to utilize Sri IIST Inc, on an exclusive basis, to provide it with the Subject Services for its customers based in the Western Region.

Sri IIST Inc represents that it will perform such service in a professional and workmanlike manner. and in accordance with industry practices and standards generally applicable to such services, and in conformity with any particular service level requirements as may be agreed upon between the parties in writing.

3. For the Subject Services (Imaging and Data Entry) provided by Sri IIST Inc for DI's existing customers, DI will pay Sri IIST Inc an amount equal to DI's invoiced amount to such customer(s) for the relevant Subject Services less twenty-five (25% paper). Where document_preparation is a separately billed Subject Service, DI will pay Sri IIST Inc an amount equal to 100% of DI's invoiced amount for document preparation. Both parties acknowledge and agree that DI's invoiced amount must reflect the current market price for such Subject Services.

For the Subject Services (Digital Film Services) provided by Sri IIST Inc for DI's existing customers, DI will pay Sri IIST Inc an amount equal to DI's invoiced amount to such customer(s) for the relevant Subject Services less thirty (30%).

In the event that DI procures additional customers in need of the Subject Services, the Sri IIST Inc charges for such work will be negotiated between the parties on a case-by-case basis.

All amounts owed by DI to Sri IIST Inc shall be due and payable within forty (40) days from the date of invoice and any payment(s) not so received shall be subject to a late payment charge of one and one-half percent (1-1/2%) per month, or the maximum amount allowed by law, whichever is less.

DI shall be responsible for the payment of all sales, use or other like taxes, if applicable, as respects all services provided by Sri IIST Inc.

4. Neither party shall be liable for any failure or delay or for damages caused by fire, vandalism, malicious mischief, acts of God, or due to other facts or circumstances beyond its reasonable control. Neither party shall, under any circumstances, be liable for any indirect, incidental, special or consequential damages (including but not limited to loss of profits, revenue or business), regardless of whether it has been advised as to the possibility of such damages, and whether such damages are sought based on breach of warranty, breach of contract, negligence, strict liability and tort, or other any legal theory. Additionally, this Agreement is not intended to, nor shall it inure to the benefit of, any third party.

5. This Agreement may not be assigned by either party without the prior written consent of the other, which consent shall not be unreasonably withheld. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their successors and assigns, as may be applicable.

6. This Agreement shall be governed by the laws of the State of California.

7. This Agreement contains the entire agreement between the parties as respects the subject matter contained herein, and supersedes all other agreements, proposals and all other communications between the parties, whether written or oral. This Agreement may not be modified, or amended in any manner except by a written agreement signed by both parties hereto.

8. In rendering the Subject Services, Sri IIST Inc is an independent contractor, and nothing contained herein shall be deemed to create any partnership or joint venture between the parties. Neither party shall have the authority to obligate the other by any agreement, warranty or representation, or by any other means. No employee or agent of either party shall be deemed

in any manner whatsoever to be an employee or agent of the other party.

9. It is the intention of Sri IIST Inc to offer employment, on an at-will basis, to DI's employees that are currently being utilized by DI in the performance of the Subject Services.

DI shall be responsible for terminating all of its employees that it no longer needs by virtue of subcontracting the Subject Services to Sri IIST Inc. DI shall be responsible for any and all obligations to such employees which accrue, or have accrued, by virtue of their employment with DI, including, without limitation, accrued vacation, PTO, sick time, etc.

DI agrees to provide Sri IIST Inc with a copy of the personnel file of each DI employee that Sri IIST Inc has agreed to hire, or is contemplating hiring. DI shall have the right to delete from such file, all information that is considered confidential and/or personal by virtue of State or Federal law.

10. DI agrees to sublet the facilities located at 5412 Bolsa Ave. Unit A, Huntington Beach, California 92649 for a period of 24-months effective April 1, 2008 and ending March, 31, 2010 at the rate of $1,350.00 per month including common area operating expenses. Sri IIST Inc may invoke an option to rent the facility for an additional (2) years commencing on April 1, 2010 and ending on March 31, 2012 at the same rate. Thirty (30) day notice is required by DI of Sri IIst intent. All utilities and maintenance are the responsibility of Sri IIst during the length of the agreement.

10. Either party may terminate this Agreement if the other party breaches any material term or condition hereof, and such breach is not remedied within thirty (30) days after the breaching party receives written notice of such breach.

11. All notices or other communications herein provided to be given, or which may be given by either party to the other, shall be deemed to have been duly given when made in writing and delivered in person, or three (3) days after such communication has been deposited in the United States Mail, postage prepaid, certified mail, return receipt requested, as follows:

Notices to Ram N Ramamurthy:Sri IIST Inc 600 Lake Air Dr #1A Waco TX 76710

Notices to DI: Data Impact, Inc.
Attn: Steve King
5432 Bolsa Avenue, Suite A
Huntington Beach, CA 92649

or to such other address as the parties may provide to each other in writing from time to time.

12. The parties each acknowledge that they are competitive with one another in providing certain services to their customers, and that they intend to remain as competitors. Subject to the express terms, conditions and limitations of this Agreement, neither this Agreement, nor any discussions and/or communications between the parties is intended to, nor shall impair or restrict the right of either party to compete with the other, whether alone or in

conjunction with third parties. Notwithstanding the foregoing, Sri IIST Inc agrees that during the term of this Agreement and for a period of two (2) years thereafter, without the prior written consent of DI, Sri IIST Inc shall not, on its own behalf or on behalf of any other person or entity, in any capacity whatsoever, directly or indirectly, provide any Subject Services to any "Customer" (as defined below) except pursuant to this Agreement. It is understood and agreed that for purposes of this Agreement, a "Customer" shall mean and include any person or entity for whom Sri IIST Inc provided Subject Services pursuant to the terms of this Agreement

13. If any provision of this Agreement is held invalid by any tribunal and a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element, and, as so modified, such provision shall be deemed a part of this Agreement. If it is not possible to modify any such provision to eliminate the invalid element, such provision shall be deemed eliminated from this Agreement. The invalidity of any provision of this Agreement shall not affect the enforceability of the remaining provisions.

14. The parties acknowledge that in the event of a breach of any of the provisions of Section 20 of this Agreement by Sri IIST Inc, DI may not have an adequate remedy at law and that, in the event of such a breach, DI shall be entitled, in addition to any other remedies, to injunctive relief against NB Sri IIST Inc. The prevailing party in any action brought to enforce the terms of this Agreement shall be entitled to recover its reasonable attorneys' fees in addition to all other recoveries available at law or in equity.

15. The failure of either party to enforce any provisions or obligations under this Agreement shall not constitute a waiver thereof or serve as a bar to the subsequent enforcement of such provision or obligation, or any other provision or obligation under this Agreement. All waivers must be in writing.

EXHIBIT A

I. EQUIPMENT PURCHASE VALUE:

Kodak 3500 Scanners/work stations

| Serial # | K# |
|---|---|
| 1. 11735021 | K 4150-8569 |
| 2. 12022916 | K 4161-7483 |
| 3 .11946620 | K 4162-5170 |
| 4. 11734343 | K 4150-8725 |
| 5. 11735150 | K 4150-8989 |
| 6 .11797376 | K 4150-9184 |

7. 11309222 K 4150-0113 ***OUT OF ORDER*** Red light comes on and states paper jam no paper is found will not let you continue scanning.

8. Contex Scanner

Total Purchase price: $ 18000

Net Monthly Credit to DI (12-month): $ 2500

II. Agreement

A. Data Impact agrees to sell the above named equipment at a purchase price of $ 18000

B. Data Impact agrees to receive purchase price in monthly increments of $ 1500 for a period of 12-months effective upon billing of month one's production. Payment for said equipment is represented in credit against monthly invoices due to Sri IIST Inc for services performed during said month.

C. Sri IIST Inc assumes all responsibility for maintenance on said equipment in Exhibit A effective on contract signing date. DI agrees to insure that all equipment is operational at the time of purchase.

D. In the event of breach of contract by Sri IIST Inc, DI may take all available measures to regain possession of said equipment outlined in Exhibit A.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized officer or agent.

Sri IIST Inc

By:

Its: Ram N Ramamurthy
President & CEO

Dated: 03/31/2008

**DATA IMPACT, INC.**

By:

Its:

Dated:

# First Amendment to Services Agreement

This amendment is made to the Services Agreement dated March 31, 2008 previously executed by and between Sri IIST Inc. "Sri IIST Inc."and Data Impact, Inc. ("DI"). (the Amendment), made as of the 30th of June 2008 (the "Effective Date").

It is mutually understood and agreed by and between the undersigned contracting parties to amend that previously executed agreement as follows:

Insert Section 16 as follows:

16. Sri IIST Inc. agrees to assume responsibility and all related costs for pickup and delivery to DI customers serviced or to be serviced by Sri IIST Inc. under this agreement. Related costs shall include but not be limited to wages for a delivery person, delivery vehicle fuel and maintenance. DI agrees to provide Sri IIST Inc. access to its delivery vehicle and related insurance only for drivers as specified in writing to DI by Sri IIST Inc. DI further agrees to provide an allowance to Sri IIST Inc. of $4,522 to cover the related costs of an employee, fuel and vehicle maintenance. Sri IIST Inc. shall include the allowance in its monthly invoice to DI.

Amend and correct Section 14 to reference Section 12 to read as follows:

The parties acknowledge that in the event of a breach of any of the provisions of Section 12 of this Agreement by Sri IIST Inc, DI may not have an adequate remedy at law and that, in the event of such a breach, DI shall be entitled, in addition to any other remedies, to injunctive relief against Sri IIST Inc. The prevailing party in any action brought to enforce the terms of this Agreement shall be entitled to recover its reasonable attorneys' fees in addition to all other recoveries available at law or in equity.

All other terms and conditions that are not hereby amended are to remain in full force and effect.

**AGREED TO BY:**

| | |
|---|---|
| **Sri IIST Inc.** | **Data Impact** |
| By: [signature] Date:06/22/2008 | By: [signature] Date: 6/22/08 |
| Ram N. Ramamurthy, President and CEO | D. Kevin Martin VP Finance and Administration |

# SALES REPRESENTATIVE AGREEMENT

**THIS AGREEMENT** is made and entered into by and between Data Impact (CD-COM Systems, Inc.) (hereinafter the "Company") and Steve King (hereinafter the "Representative"):

## WITNESSETH:

1. **ENGAGEMENT.**

(a) The Representative is hereby engaged as an independent contractor for purposes of promoting the sale of, and soliciting orders for, the Company's products ("Products"). During the term of this Agreement, the Representative shall be the Company's Representative for the Products to customers in the United States ("Customers") unless otherwise agreed to.

2. **REMUNERATION.**

(a) Representative shall be entitled to receive remuneration under this Agreement in the form of commissions on value-added resales and sales of Products made on behalf of the Company to Customers, at the rates specified in proposals generated by the Company, which are not subject to change by Representative.

(b) Commissions shall be computed based on the Company's net sale price of the Products, after deductions for taxes, freight, shipping cost, duties, insurance, and similar extra charges. Commissions shall be credited to Representative upon invoicing of the Products to the Customers and shall become payable no later than thirty (30) days following month end invoicing. Commissions cease accruing on the date of Representative's engagement is terminated, at which time the Company has thirty (30) days to issue a final check for any remaining commissions due. Representative may request audited billing records of Customers to ensure proper commissions have been paid.

(c) Company's payment of commissions shall include an itemized statement showing all credits and deductions to Representative's account for the applicable commission. Representative shall have thirty (30) days after receipt of this commission statement to notify the Company, in writing, of any errors contained in that commission statement. Corrections to the statement shall be made only in the event that timely notice of errors is given to the Company.

(d) In the event that a Customer fails to pay for Products within one hundred and twenty (120) days from the date of invoice, the Customer's account shall be turned over to the Credit Department for Collection. At that time, Representative shall relinquish and/or repay the full commission on such delinquent invoice. Any deductions for such commissions shall be itemized and contained in the commission statement provided to the Representative under subparagraph (c) above.

(e) Except as otherwise provided herein, Company shall pay Representative commission at the rate of 15% on all Products within the suite of services offered by the Company, including, but not limited to: E-Mail Archiving, all electronic data processed, e-consent, and e-payment. However, Company shall pay Representative commission at the rate of 10% on all existing accounts assigned as exclusively supported by Representative, which have been identified as Holt of California, ACS Education Services, First American Mortgage Company, Medco Health Solutions,

Tony's Fine Foods, Yellow Book. Commission rates may change only upon the prearranged agreement between both parties.

(f) Executive responsibility for all CAT dealers and CAT corporate opportunities. Company will pay Representative commission at the rate of 7.5% on all CAT dealers serviced by any and all account representatives of Company (see attached client list). Additionally, Representative will receive 15% commission on CAT dealers assigned to Representative's direct management. (ADDENDUM A)

(g) Company shall pay Representative commission at the rate of 12.5% on all pre-determined accounts serviced in Florida. . All expenses associated with maintaining these pre-determined accounts serviced in Florida will be the sole responsibility of the Representative.

(h) Except as otherwise provided herein, Company shall reimburse Representative for certain reasonable expenses associated with providing services under this Agreement, specifically those reasonable expenses associated with pre-determined trade shows to NACM and NADITA, or other Company sponsored events. Representative must comply with Company's expense reimbursement policies and/or procedures to recover any payment and must supply the Company with all expense reimbursement requests within thirty (30) days from date the expense was made to recover payment.

**3. PRICING AND TERMS.** Prices, payment terms, delivery terms, and all other terms and conditions of sale for sales of Products by the Company shall be determined exclusively by the Company, in the exercise of its sole discretion. Representative shall make quotations of process, discounts, and other terms to potential Customers only pursuant to such prices, discounts and other terms as may be published by the Company from time to time, or as may be specifically authorized by the Company in a particular intuition. Representative shall, at all times, clearly indicate to potential Customers that any and all orders, including prices and all terms of sales, are subject to acceptance or rejection by the Company.

**4. RELATIONSHIP OF PARTIES.** Representative shall perform the services under this Agreement as an independent contractor. Representative shall complete the services required hereunder according to his own means and methods of work, which shall be in the exclusive charge and control of Representative and which shall not be subject to the control or supervision of Company, except as to the results of the work. Representative shall be entirely and solely responsible for his acts. Representative will indemnify and hold harmless Company from and against any claim, damage, expense, tax, interest, penalty, judgment or costs incurred or suffered, directly or indirectly, by Company arising out of or connected with any action or inaction of Representative. Except as otherwise provided herein, Representative shall have no right to bind Company, transact any business in Company's name or on behalf of Company in any manner or form, or make any promises or representation on behalf of Company.

Representative shall be fully responsible for and shall indemnify and hold harmless Company for any and all federal, state, and local taxes and all withholdings applicable to any and all income made in furtherance of this Agreement.

**5. RESTRICTIVE COVENANTS.**

(a) Due to Representative's access to Confidential Business Information, as defined below, Representative agrees that during the term of this Agreement and for a period of eighteen (18) months after the Agreement is terminated, he shall not engage, contact or solicit any

Customer, on his own behalf or the behalf of any other company or individual, for the purpose of selling electronic services that are the same or similar as the Products sold by Representative to such Customer.

(b) The Representative shall not, at any time after execution of this Agreement, disclose any confidential business information or trade secrets (hereinafter: Confidential Business Information: and defined in subparagraph (c) below) of the Company to any entity or person outside of the Company. The Representative shall not use Confidential Business Information of the Company for its own benefit, except to discharge its duties and obligations under this Agreement. The Representative agrees that all Confidential Business Information is the exclusive property of the Company.

(c) Confidential Business Information includes all business, sourcing, marketing, and distribution information regarding or affecting the Company which the Representative receives, becomes aware of, conceives, or develops as a direct or indirect result of its relationship with the Company.

(d) Failure to mark or designate any Confidential Business Information as confidential or proprietary shall not affect the status of such information as Confidential Business Information under this Agreement.

(e) The Representative agrees that any breach of the restrictive covenants contained in this Paragraph 5 by the Representative will cause the Company irreparable injury for which there is no remedy at law and for which money damages will not adequately compensate the Company. Therefore, the Representative agrees that any violation of its restrictive covenants under this Paragraph 5 shall entitle the Company to injunctive relief from a court to prevent violation, and that such relief shall be in addition to any other damages, rights, or remedies the Company may have at law or in equity.

**6. TERM AND TERMINATION.** The term of this Agreement shall begin as of ______________, 2008, and shall continue until such time as it is terminated by either party upon thirty (30) days written notice to the other party (the "Term"). Paragraph 5 shall survive the termination of this Agreement.

Only in the event that the Company terminates this Agreement, during any Term, without Cause, the Company shall pay Representative a monthly "Termination Payment" for eighteen (18) months. The monthly Termination Payment shall be equal to Representative's average monthly commission payment under this Agreement for the three (3) month period immediately preceding the date Company gives notice to Representative that it is terminating the Agreement without Cause. The monthly Termination Payments shall commence in the month following the conclusion of the thirty (30) day termination notice period outlined above.

The term "Cause" as used herein shall mean a reasonable determination by the Company that Representative:

(a) Engaged in conduct that is disruptive to the Company's business, or that is disruptive of or alienates customers, employees, or management of the Company;

(b) Engaged in unauthorized conduct or behavior that has the potential to expose the Company to liability or otherwise jeopardize the Company's business interest;

(c) Has been charged or convicted of any crime constituting a felony or involving moral turpitude or controlled substance; or

(d) Materially breached any term or condition of this Agreement.

**7. NOTICES.** Any notice required or permitted by this Agreement shall be in writing and shall be sufficient if delivered personally or by certified or registered mail to the other party at the addresses shown below:

Company:

Data Impact
5432 A Bolsa Ave
Huntington Beach, California 92646
Attn: Bill Plant-Mason

Representative:

Steve King
9532 Drumbeat Drive
Huntington Beach, California 92646

**8. ARBITRATION.** Except as provided in Paragraph 5, any dispute, controversy, or claim arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a panel of three arbitrators in accordance with the rules of the American Arbitration Association then if in effect. One arbitrator shall be selected by the Company, one by the Representative, and one by the two selected arbitrators. The decision of the panel shall be final and finding upon the parties will be entered in any court having jurisdiction. Unless otherwise provided by the rules of the Association, the arbitrators shall, in their award, allocate between the parties the costs of arbitration, which shall include expenses, in such proportions as the arbitrators deem just.

**9. CHOICE OF LAW.** This agreement shall be governed by the interpreted and construed in accordance with the laws of the State of California.

**10. SEVERABILITY.** In the event that any provision of this Agreement is held invalid or unenforceable, the same shall not affect the validity or enforceability of any other provision of this Agreement.

**11. ENTIRE AGREEMENT.** This Agreement supersedes all previous Agreements between the parties with respect to its subject matter and there are no promises, representations or understandings between the parties, either prior to or contemporaneous with the execution hereof, except as expressly set forth herein.

**12. MODIFICATIONS.** This Agreement may be altered or modified only by a written instrument signed by the parties hereto.

**13. WAIVER.** The Company's waiver of any of its rights under this Agreement shall not constitute a waiver of the same right or of any other right on any subsequent occasion.

**IN WITNESS WHEREOF,** the Company has caused this Agreement to be executed in its name and behalf the 22nd day of March 2008.

**Data Impact**

**By** ______________________________

**Bill Plant-Mason**

**REPRESENTATIVE:**

______________________________

**Steve King**

# EXHIBIT "C"

data/impact

January 1, 2007

# INFORMATION MANAGEMENT SERVICES AGREEMENT

THIS INFORMATION MANAGEMENT SERVICES AGREEMENT (this "Agreement") is entered into as of this 6th day of ~~September, 2006~~ (the "Effective Date"), by and between CD-COM SYSTEMS, INC. (d/b/a Data Impact), an Indiana corporation ("Data Impact") and Holt of California.

## RECITALS:

A. Data Impact provides a variety of information management services including processing, indexing and storing pieces of information in a format that enables its customers to efficiently manipulate and retrieve the information; and

B. Holt of California wishes to engage Data Impact to provide certain information services and Data Impact wishes to accept such engagement all upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the above recitals and the covenants contained in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## SERVICES

1.1 Engagement. Holt of California hereby engages Data Impact to provide the information services more fully described in the Proposal attached as Schedule A to this Agreement (the "Services"), and Data Impact hereby accepts such engagement, all upon the terms and conditions set forth in this Agreement.

1.2. Fees. In exchange for the Services provided or delivered by Data Impact to Holt of California under the terms of this Agreement, Holt of California shall pay to Data Impact the fees (the "Fees") described in and/or computed in accordance with the rates set forth in Schedule A (the "Fee Schedule"). On each anniversary of the Effective Date, Data Impact may, at its discretion, modify and amend the Fee Schedule upon forty-five (45) days' prior written notice to Holt of California. Holt of California may terminate the agreement if the revised fee schedule is not acceptable to Holt of California.

1.3. Invoicing and Payment. Data Impact will invoice Holt of California monthly for all Services rendered during the preceding month, unless otherwise specified in Schedule A. Holt of California payment on these invoices is required within thirty (30) days of the invoice date in U.S. dollars, without any right of set-off or chargeback. If Holt of California does not pay any amount invoiced under this Agreement, Data Impact may elect to charge Holt of California (i) interest up to the maximum amount allowed by law on all unpaid amounts and (ii) any collection costs incurred by Data Impact (including attorney's fees).

1.4. Expenses. Holt of California shall be responsible for delivering and picking up the information at Data Impact's location designated on Schedule A.

1.5. Termination. This Agreement shall continue for consecutive three (3) year terms upon mutual agreement of both parties or may be terminated with 30-day notice.

data/impact

**ARTICLE II**
**CONFIDENTIAL INFORMATION**

**2.1.** **Non-Disclosure.** Without the prior written consent of Holt of California which consent may be withheld, Data Impact covenants and agrees that it will not disclose, and shall keep strictly confidential, any Information received from Holt of California which is non-public, "trade secret" (as that term is defined under the Uniform Trade Secrets Act), confidential and/or proprietary in nature, whether oral, written, or in the form of electronic data, including, without limitation, financial information, business plans and services, customer information, licensing and distributor information, or employee information (collectively, the "Information"), whether received from Holt of California or its agents.

Nothing contained in this Agreement will in any way restrict the right of Data Impact to use or disclose any information received from Holt of California regarding the Information that: (a) is or becomes generally available to the public other than by breach of this Agreement or breach of any other agreement to which Holt of California is a party; (b) is independently developed by Data Impact as demonstrable by competent documentary evidence; (c) to the extent required, is required to be disclosed pursuant to governmental or judicial process pursuant to Section 2.3 of this Agreement; or (d) is already known to Data Impact at the time of disclosure thereto by Holt of California as demonstrated by competent documentary evidence. Specific disclosures made by Holt of California under this Agreement shall not be deemed to be within the foregoing exceptions to non-disclosure merely because the disclosures are embraced by more general information in the public domain or in the possession of Data Impact. In addition, any combination of features shall not be deemed to be within the foregoing exceptions to non-disclosure merely because individual features are separately in the public domain or in the possession of Data Impact, but only if the combination itself and its principle of operation are in the public domain or in the possession of Data Impact prior to the disclosure by Holt of California.

Data Impact shall take reasonable measures to cause its officers, employees, agents or independent contractors (its "Representatives") to adhere to the obligations and covenants contained herein.

**2.2.** **Protection of Information.** Data Impact shall take reasonable measures to protect against unauthorized copying, disclosure or use by it or its Representatives of any Information obtained from Holt of California Or Holt of California agents.

**2.3.** **Disclosure.** If Data Impact is requested or required in a judicial, administrative, or governmental proceeding to disclose any Information, Data Impact agrees to notify Holt of California as promptly as practicable so that Holt of California. may either seek an appropriate protective order or waive the provisions of this Agreement. If Holt of California is unable to obtain an appropriate protective order and Holt of California is unwilling to waive the provisions hereof, Data Impact may disclose that portion of the Information regarding Holt of California which Data Impact's legal counsel advises that it is compelled to disclose. In addition, Data Impact shall notify Holt of California immediately of any loss, misuse or misappropriation of any Information of which Data Impact becomes aware.

**2.4.** **Copying and Return of Documents.** Without the prior written consent of Holt of California which consent may be withheld, Data Impact covenants that it will not, and its Representatives will not, make copies of any Information obtained from Holt of California or its agents, except for copies made in furtherance of the Services.

Upon the written request of Holt of California Data Impact will promptly return and will cause its Representatives to return to Holt of California all Information provided by Holt of California or its agents, and all copies, summaries, abstracts and other materials derived from such Information (including but not limited to electronically stored data, disks and tapes), which Data Impact or its Representatives have possession of or have the right to possession of, and all rights of Data Impact and its Representatives with respect to such Information shall thereupon forever cease and terminate.

**2.5. Remedies.** Data Impact acknowledges and agrees that Holt of California will suffer irreparable damage and injury and will not have an adequate remedy at law in the event of a breach by Data Impact of one or more of the provisions of this Article II. Accordingly, in the event of such a breach or a threatened or attempted breach, Holt of California shall be entitled to a temporary and permanent injunction or a decree of specific performance of the provisions hereof.

**2.6. Infringement; Indemnification.** Holt of California represents and warrants to Data Impact that the delivery of the Information to Data Impact pursuant to this Agreement will not violate or infringe the rights of any third party and Holt of California agrees to indemnify and hold Data Impact harmless from all liabilities, claims, demands, damages and other costs and expenses (including attorney's fees) arising from such claims by a third party.

## ARTICLE III
## INTELLECTUAL PROPERTY

Holt of California acknowledges and agrees that the processes, procedures and software underlying the Services constitute valuable proprietary products and trade secrets belonging to Data Impact and embody substantial creative efforts, confidential information, ideas and expressions. As a result, Holt of California shall not, and shall not allow any of its officers, employees, agents or independent contractors to, decompile, disassemble or reverse engineer any product or software delivered to Holt of California in connection with the Services.

## ARTICLE IV
## DISCLAIMER OF WARRANTIES; LIMITATION OF LIABILITY

**4.1. Limited Warranty.** Data Impact warrants to Holt of California that the Services will be performed in a professional and workmanlike manner, consistent with generally accepted industry standards. For any breach of this warranty claimed by Holt of California. Holt of California shall provide written notice to Data Impact outlining the suspected defect and Data Impact's sole and exclusive liability and Holt of California sole and exclusive remedy shall be, at Data Impact's sole discretion, either (a) Data Impact's reperformance of the Services involving the suspected defect or (b) Data Impact's refund of that portion of the Fees related to the suspected defect.

**4.2 Disclaimer of Warranty.** EXCEPT AS EXPRESSLY STATED IN THIS ARTICLE IV, THERE ARE NO WARRANTIES, EXPRESS OF IMPLIED, BY OPERATION OF LAW OR OTHERWISE, PERTAINING TO THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT, AND DATA IMPACT DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**4.3. Limitation of Liability.** The maximum liability of Data Impact for damages relating to Services provided pursuant to this Agreement, whether arising from a cause of action sounding in contract, tort or otherwise, shall be the amount of Fees paid to Data Impact by Holt of California in no event shall Data Impact be liable to Holt of California or any third party for any lost profits, business interruption or other indirect, incidental, special, consequential, exemplary or punitive damages arising out of or related to this Agreement or the performance or breach thereof. Holt of California maximum liability shall not exceed the value of the contract fee.

## Pricing - Schedule A REVISED AS OF 8/1/06

**Prepared For:** Holt of California

**Date** 8/27/2006

| Electronic Data Processing Charges | |
|---|---|
| Price Per Page Processed | $0.015 |
| E-mail notification (attachment) per invoice | $0.045 |
| E-mail notification (view only) per invoice | $0.02 |
| Electronic Bill Payment per transaction | $0.50 |
| Electronic Bill Payment per invoice | $0.10 |

| Imaged Data Processing Charges | |
|---|---|
| Price Per Page Scanned (AP VENDOR FILES) | $0.07 |
| Data Entry (AP VENDOR FILES--INV#, NAME, VOUCHER DATE, AMOUNT) | $0.03 |
| Price Per Page Scanned (AR REMITTANCES) incl. data entry | $0.09 |
| Price Per Page Scanned (CREDIT FILES) incl. data entry | $0.07 |
| Price Per Page Scanned (CREDIT CARD PAYMENTS) incl. data entry | $0.09 |

| Programming Charges | |
|---|---|
| Price per Initial Application Setups | $250.00 |
| Price per Initial WEB client setup | $75.00 |
| Price per Initial Application Setups | $250.00 |
| Eletronic Bill Payment one-time setup | $7,500.00 |

| Web Hosting Charges | |
|---|---|
| Flat rate price per month for WEB hosting 5 year retention thru 12/31/2008 | $3,500.00 |
| NOTE: Once five year retention has been met we will roll-off one year at a time beginning in 2008 | |

| Other Charges | |
|---|---|
| Price per Original DVDs/CD's (monthly WEB backup) | $35.00 |
| Price per Duplicate DVDs/CD's | $35.00 |
| Offsite Data Storage - Price per month | $50.00 |
| Pickup and Delivery Charges per Instance | $25.00 |
| Document Preparation | TBD |

**PROOF OF SERVICE**
**C.C.P. §1013(a), C.R.C. 2003(3), 2005(i)**

*Re: Data Impact v SRI, et al; OCSC, Central Justice Center Case No. 30-2009-00119746*

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 years and am not a party to the within action; my business address is 535 Anton Boulevard, Tenth Floor, Costa Mesa, California 92626-1977.

On **June 19, 2009**, I served the foregoing document described as **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** on the interested parties in this action.

by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

| | | |
|---|---|---|
| | Jeffrey S. Simon, Esq.<br>David A. Simon, Esq.<br>Samantha E. Allswang, Esq.<br>**Philipson & Simon APC**<br>2400 E. Katella Avenue, Suite 1050<br>Anaheim, CA 92806 | Michael Willoughby, Esq.<br>**Specter & Willoughby, LLP**<br>4685 MacArthur Court, Suite 422<br>Newport Beach, California 92660 |
| | **BY REGULAR MAIL:** I deposited such envelope in the mail at 535 Anton Boulevard, Costa Mesa, California 92626. The envelope was mailed with postage thereon fully prepaid.<br><br>I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | |
| | **BY FACSIMILE MACHINE:** I transmitted a true copy of said document(s) by facsimile machine, and no error was reported. Said fax transmission(s) were directed as indicated on the service list. | |
| | **BY OVERNIGHT MAIL:** By depositing copies of the above document(s) in a box or other facility regularly maintained by FEDERAL EXPRESS, in an envelope or package designed by FEDERAL EXPRESS with delivery fees paid or provided for and sent to the person(s) named on the attached service list [C.C.P.§1013, 2015.5]. | |
| X | **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s) by Nation Legal, Inc.. | |

(State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

(Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **June 19, 2009**, at Costa Mesa, California.

Gina Minculescu

Gina Minculescu

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
535 Anton Boulevard, Tenth Floor
Costa Mesa, California 92626-1977

# EXHIBIT C

Prairie State
Administrative Services, Inc.

October 19, 2009

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

DI IMAGING
Attn. Mr. Steve King
9532 Drumbeat Drive
Huntington Beach, CA 92646

Michael L. Willoughby, Esq.
Specter & Willoughby
4685 MacArthur Court, Suite 422
Newport Beach, CA 92660

| | | |
|---|---|---|
| **Re:** | **Insured:** | **DI Imaging** |
| | **Claimant** | **Data Impact, Inc.** |
| | **Policy No.:** | **PS0000003286300** |
| | **PSAS File No.:** | **TK200545** |

Dear Mr. King and Mr. Willoughby:

Prairie State Administrative Services, Inc. is the underwriting manager and claims representative for State Farm Fire & Casualty Company (the "Company") which provided a "Technology Services Errors and Omissions Liability Insurance Policy" to DI Imaging, policy number PS0000003286300 (the "Policy"). In that capacity, we acknowledge receipt of the suit filed by Data Impact, Inc. ("Plaintiff") in the Orange County Superior Court, case number 30-2009-00119746 captioned *Data Impact, Inc. V. SRI IIST, Inc. et al.* (the "Action").

Based on the information supplied to date, it does not appear that there is coverage for the Action under the Policy. Nevertheless, the Company would like to perform additional investigation work before making a final decision. In order to prevent any prejudice while the Company continues its investigation, the Company will accept the defense of Crown Technology Assisted Business Services Corp. ("C-TABS"), Steve King and Amanda Powell against the Action in strict accordance with the terms of the Policy and subject to the reservation of rights contained in this letter during its continued investigation. The Company expressly reserves all of its rights to withdraw its defense and to recoup from you any payments of defense expenses if the Company's continued investigation confirms that there is no coverage. In order to ensure that the Company's views are fully understood, the following summary of the Company's coverage analysis is provided.

**BACKGROUND FACTS:**

By letter dated August 4, 2009, DI Imaging, Steve King individually and dba DI Imaging, C-

TABS and Amanda Powell tendered their defense of the First Amended Complaint ("FAC") in the Action. The Action alleges a scheme by former employees to steal Data Impact's trade secrets and set up a competing company. We do not assume that the Plaintiff's allegations in the Action are true. However, in order to analyze coverage, we must first analyze what factual claims the Plaintiff is making and then determine how those claimed facts relate to the coverage provided by the Policy.

According to the FAC and Data Impact's website, Data Impact is in the electronic commerce business primarily providing clients with paperless record keeping and computerized invoicing systems. Data Impact alleges it has created a comprehensive software program to provide these services that is tailored to individual client's needs.

The FAC alleges the following: Steve King and Amanda Powell were employees of Data Impact. Both King and Powell executed confidentiality agreements. SRI IIST dba RT Imaging was a subcontractor hired by Data Impact to provide digital processing services in Florida and California. Natarajan Ramamurthy is the principal of SRI IIST. John Tanner is a business partner with Ramamurthy.

Ramamurthy, Tanner, King and Powell conspired together as early as November 2007 to steal at least a portion of Data Impact's business. As part of the scheme, Ramamurthy, King and Powell accessed Data Impact's computer servers to steal trade secret information. King, Powell C-TABS and DI Imaging encouraged Data Impact customers to request back-up copies of information on Data Impacts servers that they could later use to compete with Data Impact. Ramamurthy and Tanner used this information to create a software suite similar to Data Impact's. After creating the software suite, Ramamurthy, King and Tanner used the stolen trade secret information, which includes customer lists, to solicit Data Impact's customers beginning in or about May 2008.

On March 31, 2008, King quit Data Impact as an employee but continued to work for Data Impact as an independent contractor on a non-exclusive basis pursuant to a written contract. On this same day, King entered into a consulting agreement with SRI IIST. On January 5, 2009, King gave 30 days notice that he was terminating his independent contractor agreement with Data Impact. On this same day, Powell quit and went to work for DI Imaging and C-TABS.

The FAC asserts causes of action against King, C-TABS and Powell as follows:

> First cause of action for violation of California Uniform Trade Secrets Act;
>
> Second cause of action for violation of California Penal Code § 502(c) against Powell and King. Penal Code § 502(c) makes it a crime to "knowingly" access a computer system without permission;
>
> Fourth cause of action for breach of contract against King for breaching his non-disclosure and sales representative agreement;
>
> Fifth cause of action for intentional interference with contract (King's non-disclosure and sales representative agreements) against Powell;

Sixth cause of action for intentional interference with contract (SRI IIST's California services agreement);

Seventh cause of action for intentional interference with the contracts between Data Impact and its clients;

Eighth cause of action for intentional interference with prospective economic advantage against King and Powell;

Ninth cause of action for breach of fiduciary duty against King and Powell;

Tenth cause of action for unfair competition (Business and Professions Code § 17200); and

Eleventh cause of action for unfair and deceptive trade practices (Business and Professions Code § 17500).

The FAC seeks monetary damages, an injunction, restitution, civil penalties and punitive damages.

**COVERAGE ANALYSIS:**

The Policy is claims made with a policy period of October 2, 2008 to October 2, 2009 and a retroactive date of October 2, 2008. The Policy has limits of $ 1 million per claim and in the aggregate, subject to a $2,500 retention. The Insuring clause of the Policy provides:

> We will pay on Your behalf those sums in excess of the retention and up to the applicable Limit of Liability stated in Item 4. of the Declarations page that You become legally obligated to pay as Damages or Defense Costs because of Claims as a result of a Wrongful Act in performing Technology Services. Depending on where a Claim is first brought, We will have the right and duty to appoint an attorney, investigate and defend any Claim to which this insurance applies, even if the allegations are groundless, false or fraudulent, or We will reimburse You for the reasonable cost of investigation and defense of any such Claim, as provided in Part 5.B. below.

Thus, the Policy only provides coverage for alleged "Wrongful Acts" in performing "Technology Services". The Policy defines "Wrongful Act" as:

1. A negligent act, error or omission;

2. Failure to prevent a party other than any of You from:

unauthorized access to, use of, tampering with or introduction of malicious code into data, programs or systems;

3. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organizations's goods, products or services;

4. Oral or written publication of material that violates a person's right to privacy;

5. False arrest, detention or imprisonment;

6. Wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;

7. Malicious prosecution; or

8. Unintentional breach of warranties or representations made by You regarding the fitness, quality, durability and standards of Your performance of Technology Services.

The Policy defines "Technology Services" as:

1. The development, programming, integration, implementation, installation, maintenance and repair of software, code, hardware, equipment, devices and components;

2. Management, administration, hosting or operation of another party's systems (outsourcing services);

3. Systems facility management;

4. Systems consulting including software, hardware, equipment, device and components analysis and recommendations;

5. The distribution, licensing, sales, marketing, training and customer support in the use of software and hardware including freeware, shareware, firmware, equipment, devises and components; or

6. Data processing, management, storage and warehousing.

**Who Is An Insured:**

The August 4, 2009 letter from Mr. Willoughby tendered the defense of the Action on behalf of "DI Imaging," Steve King individually and dba DI Imaging, C-TABS and Amanda Powell.

The named insured on the Policy is "DI Imaging." The defense of the Action was tendered by "DI Imaging" and "Steve King dba DI Imaging." According to the California Secretary of State, "DI Imaging" is a California corporation established on May 19, 2008. In a phone conversation with us, Mr. Willoughby stated that when King applied for the Policy, he intended to create a corporation called DI Imaging to be the named insured, but subsequently learned that Mr. Ramamurthy had already created a corporation with that name. King therefore, created C-TABS instead. According to the California Secretary of State, C-TABS is a California corporation established on January 6, 2009.

This raises the question of who is the named insured on the Policy. We understand that King signed the application for the Policy (the signature is illegible). King signed the application as the "President" of "DI Imaging" a corporation that we now know never came into existence. Since King signed the application as "President," he is not the named insured in his individual capacity. The inception date of the Policy is October 2, 2008. Since C-TABS was created after the Policy incepted, C-TABS cannot be the named insured. It therefore, appears that there is no named insured.

The Policy defines "insured" to include employees of the named insured but only for Wrongful Acts within the scope of their duties for the named insured. The application for the Policy lists both King and Powell as employees of "DI Imaging." Therefore, regardless of who is the named insured, King and Powell are potentially insureds insofar as they may be alleged to have committed Wrongful Acts within the scope of their duties for "DI Imaging." As discussed above, many of the alleged actions by King and Powell supposedly occurred while they were working for Data Impact and before they went to work using the name DI Imaging. There is no coverage for them for these alleged actions committed before they became employed by "DI Imaging."

Due to the confusion regarding this issue, the Company will accept the defense of King, Powell and C-TABS, but the Company reserves all of its rights with respect to who is an insured under the Policy, including the right to withdraw its defense on the basis that King, Powell and C-TABS are not insureds under the Policy. For ease of reference however, we will refer to C-TABS, King and Powell as "insureds" in this letter.

**There Is No Coverage Because The Action Does Not Allege A Wrongful Act in Technology Services:**

There is no coverage for the Action because it does not allege any alleged Wrongful Acts in Technology Services. The Policy lists eight different acts that qualify as "Wrongful Acts." The only two even arguable definitions of Wrongful Act applicable to the Action are:

1. A negligent act, error or omission;

2. Failure to prevent a party other than any of You from: unauthorized access to, use of, tampering with or introduction of malicious code into data, programs or systems;

With respect to definition 1., the Underlying Action does not allege any negligent acts by C-TABS, King or Powell, rather it alleges only intentional conduct. With respect to definition 2., the Underlying Action alleges that the insureds stole the trade secrets, not that they failed to prevent others from stealing them. Furthermore, the allegations that the insureds stole trade secrets is not an act in furtherance of providing Technology Services. The alleged stealing of trade secrets is not the provision of any services to third party clients of the insureds and therefore, not within the Policy's definition of Technology Services.

**Exclusions to Coverage:**

The Policy exclusions bar coverage for some, but not all, of the causes of action alleged against the insureds.

Second cause of action for violation of California Penal Code § 502(c)

Coverage for this cause of action is excluded by exclusion C.1.f. which excludes:

> Unauthorized access to, use of, tampering with or introduction of malicious code into data or systems by any of You or person who would qualify as You but for their acts being outside the scope of their duties as a partner, officer, director, or employee of the Named Insured.

Fourth cause of action for breach of contract

Coverage for this cause of action is excluded by exclusion C.3.b. which excludes:

> The breach of express warranties, guarantees or contracts;

and exclusion C.1.h. which excludes:

> Assumption of liability by any of You under any contract or agreement. This exclusion does not apply to liability You would have incurred in the absence of such contract or agreement;

Tenth cause of action for unfair competition (Business and Professions Code § 17200) and Eleventh cause of action for unfair and deceptive trade practices (Business and Professions Code § 17500)

Coverage for these causes of action is potentially excluded by exclusion C.1.d. which excludes:

> Unfair competition, restraint of trade or any other violation of antitrust laws;

**Other Limits on Coverage:**

The Action is premised upon claims of intentional misconduct. The Policy excludes indemnification for, but not the defense of, claims for intentional misconduct. Exclusion C.3.b. excludes:

> Any act or omission that a jury, court or arbitrator finds dishonest, fraudulent, criminal, malicious or was intentionally committed while knowing it was wrongful.

Therefore, if after trial it is determined that the insureds did act intentionally, there is no duty to indemnify. Indemnification would also be precluded by California Insurance Code § 533.

The Policy only provides coverage for Wrongful Acts committed during the policy period. Policy Part 5.D.2. The Action alleges misconduct beginning in 2007 and continuing thereafter. There is no coverage for any misconduct occurring before the Policy's October 2, 2008 inception date. The Policy's retroactive date is also October 2, 2008.

The Action seeks monetary damages, but it also seeks restitution, civil penalties and punitive damages which are not covered by the Policy. Under California law, restitution is not covered by a liability policy. *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254. The Policy's exclusion C.1.g. excludes restitutionary claims as follows:

> Gain, profit or advantage to which any of You are not legally entitled;

The Policy's definition of "Damages" excludes restitution and civil penalties as follows:

> "Damages" means money judgment, award or settlement, except those for which insurance is prohibited by law. Damages does not include:
>
> 1. Fines or penalties;
>
> ...
>
> 3. Loss or disgorgement of profits by any of You; ...

California law precludes indemnification for punitive damages. *Insurance Code* § 533.

**PROVISION OF A DEFENSE AGAINST THE ACTION:**

While it appears that there is no coverage for the Action under the Policy, in an abundance of caution, the Company intends to continue its investigation. In order to prevent any prejudice while the Company continues its investigation, the Company will accept the defense of C-TABS, King and Powell against the Action. As mentioned above, the Company expressly reserves all of its rights to withdraw its defense and to recoup any payments of defense expenses if the Company's continued investigation confirms that there is no coverage.

Under California law, an insured is entitled to independent defense counsel if there is a conflict of interest between the insured and the insurer and defense counsel can control the outcome of that coverage issue. Civil Code § 2860. The Company does not believe that independent defense counsel is required here. However, in an abundance of caution the Company offers you independent counsel if you so choose.

We understand that you are also being defended by another State Farm policy managed by a different State Farm office. We have contacted the claims adjuster for the other State Farm office to coordinate the provision of your defense. We understand, that the other State Farm policy is reimbursing Spector & Willoughby as independent defense counsel for King and C-TABS and Philipson & Simon as independent defense counsel for Powell at the rate of $165/hour. Mr. Willoughby has advised us that his normal hourly rate is $325 an hour and that King has been paying him the $160/hour difference between his normal rate and the amounts reimbursed by the other State Farm policy. Mr. Willoughby has requested us to pay this $160/hour difference. However, under California law, independent defense counsel are not entitled to charge more than the statutory rate just because there is more than one insurer involved. *San Gabriel Valley Water Co. v. Hartford* (2000) 82 Cal.App.4th 1230. We will make arrangements to share the costs of defense with the other State Farm policy. Please note that our duty to defend did not begin until the date the Action was tendered to us and is subject to the Policy's $2,500 Retention. If you so request, we will be pleased to provide you with a list of counsel who will accept the $165 rate.

If you have any questions or concerns or believe that any of the above facts or analysis are inaccurate or if there are any additional facts or analysis that you believe are relevant, the Company would be pleased to consider them.

**Please be reminded that you may have this matter reviewed by the California Department of Insurance, Consumer Communications Bureau, 300 South Spring Street, South Tower, Los Angeles, California 90013, 1-800-927-HELP or 213-897-8921.** In the interim, we welcome any questions or comments you may have regarding the Company's position as expressed above and again invite you to submit any additional information you believe is germane to the coverage determination in this matter. Please feel free to call the undersigned if you have any questions or comments at (312) 258-3370. In particular, please advise the undersigned immediately if you are aware of further or different facts that could have a bearing on our position regarding coverage of the captioned matter. All your correspondence concerning coverage should be directed to the undersigned. Any questions you have concerning your defense should be directed to the law firm of either Spector & Willoughby or Philipson & Simon.

Sincerely,

Traci E. Gill, Esq.
Senior Claims Examiner

cc: THOMAS J FERRARO STATE FARM AGENCY
18892 Brookhurst Street
Fountain Valley, CA 92708-7304

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself [ ])

State Farm Fire & Casualty Company, an Illinois Corporation,

**DEFENDANTS**

Crown Technology Assisted Business Services, Corp.,a California Corporation; Steve King and Amanda Powell,

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

JOHN M. HOCHHAUSLER, ESQ.
MANNING & MARDER, KASS, ELLROD, RAMIREZ LLP
801 S. FIGUEROA STREET
15TH FLOOR
LOS ANGELES, CA 90017
213-624-6900

Attorneys (If Known)

COPY

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only** (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in this State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. ORIGIN** (Place an X in one box only.)

[X] 1 Original Proceeding [ ] 2 Removed from State Court [ ] 3 Remanded from Appellate Court [ ] 4 Reinstated or Reopened [ ] 5 Transferred from another district (specify): [ ] 6 Multi-District Litigation [ ] 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** [ ] Yes [X] No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** [ ] Yes [X] No

[X] **MONEY DEMANDED IN COMPLAINT: $** Not yet known

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28. U.S.C. SECTION 1332 (a)
DECLARATORY RELIEF-INSURANCE COVERAGE

**VII. NATURE OF SUIT (Place an X in one box only.)**

**OTHER STATUTES**
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Act
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Info. Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

**CONTRACT**
- [X] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Fed. Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury-Med Malpractice
- [ ] 365 Personal Injury-Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus-Alien Detainee
- [ ] 465 Other Immigration Actions

**TORTS PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 445 American with Disabilities - Employment
- [ ] 446 American with Disabilities - Other
- [ ] 440 Other Civil Rights

**PRISONER PETITIONS**
- [ ] 510 Motions to Vacate Sentence Habeas Corpus
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus/ Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

**FORFEITURE/ PENALTY**
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: SACV10-00286

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No [ ] Yes

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No [ ] Yes

If yes, list case number(s):

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)

[ ] A. Arise from the same or closely related transactions, happenings, or events; or
[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
[ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | ILLINOIS |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County- ALL DEFENDANTS | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature] **Date** March 08, 2010

JOHN M. HOCHHAUSLER, ESQ.

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

**SACV10- 286 CJC (MLGx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[X] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 02/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

State Farm Fire & Casualty Company, an Illinois Corporation,
*Plaintiff*
v.
Crown Technology Assisted Business Services, Corp; a California Corporation; Steve King and Amanda Powell,
Defendants.

Civil Action No. SACV10-00286 CJC MLGx

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

Crown Technology Assisted Business Services, Corp.,a California Corporation; Steve King, an individual; and Amanda Powell,an individual,

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

John M. Hochhausler, Esq.
Manning & Marder, Kass, Ellrod, Ramirez LLP
801 S. Figueroa Street,
15th Floor
Los Angeles, California 90017
Tel.: 213-624-6900; Fax.: 213-624-6999

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

CHRISTOPHER POWERS

Date: MAR - 9 2010

*Signature of Clerk or Deputy Clerk*